UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| KAREN LESTER,<br>*Plaintiff*<br><br>V.<br><br>WILEY COLLEGE,<br><br>       *Defendant.* | Case No. 2:23-cv-00624<br><br><br><br>(JURY DEMANDED) |

## PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

TO THE HONORABLE JUDGE OF SAID COURT:

Karen Lester brings this action under 31 U.S.C. §§ 3729 - 3733 (the "False Claims Act") and 41 U.S.C. § 4712 (the "National Defense Authorization Act" or the "NDAA") to recover from Wiley College for all damages, penalties, and other remedies available under the False Claims Act and would show unto the Court the following:

### PARTIES

1. Plaintiff Karen Lester is a resident and citizen of the State of Texas.

2. Defendant Wiley College may be served with process by serving its registered agent: **Haywood L. Strickland, 711 Wiley Avenue, Marshall, TX 75670 USA**.

### VENUE & JURISDICTION

3. This case arises under the Court's federal question jurisdiction based on Plaintiff's claim under 41 U.S.C. § 4712 and 31 U.S.C. 3730(h), and jurisdiction is proper in this Court

1

under 28 U.S. Code § 1331.

4.  Venue in this District is proper as it satisfies the requirements of 28 U.S.C. § 1391, in that a substantial part of the events and omissions giving rise to the claim occurred in Marshall, Texas.

5.  This Court has jurisdiction over Plaintiff's claims pursuant to 41 U.S.C. § 4712(C)(2), which permit Plaintiff to "kick out" her claim from administrative review to an appropriate United States District Court if the head of the executive agency has not issued a final decision within 210 days. Under 41 U.S.C. § 4712(C)(2), "[i]f the head of an executive agency issues an order denying relief under paragraph (1) or has not issued an order within 210 days after the submission of a complaint under subsection (b), or in the case of an extension of time under paragraph (b)(2)(B), not later than 30 days after the expiration of the extension of time, and there is no showing that such delay is due to the bad faith of the complainant, the complainant shall be deemed to have exhausted all administrative remedies with respect to the complaint, and the complainant may bring a de novo action at law or equity against the contractor, subcontractor, grantee, subgrantee, or personal services contractor to seek compensatory damages and other relief available under this section in the appropriate district court of the United States, which shall have jurisdiction over such an action without regard to the amount in controversy."

## FACTUAL BACKGROUND

6.  This is a retaliation lawsuit. Specifically, Wiley College violated the retaliation provision of 41 U.S.C. § 4712 and 31 U.S.C. 3730(h) by firing Ms. Lester for her reports of gross mismanagement, waste, and false claims to the federal government.

7. In more detail, Wiley College employed Ms. Lester as the Coordinator for Distance and Adult Education. As the Coordinator, Ms. Lester assisted with facilitating the management of Wiley College's Second Chance Pell Correctional Educational Programs, the Organization Management Program, and the Criminal Justice Administration Program at Shreveport. Ms. Lester also ensured the consistent representation of Wiley College regarding the programs and activities of Extended Education, worked closely with other personnel to assist non-traditional students, communicated with prospective students, handled the enrollment data, trend analyses, and other reports. Ms. Lester also logged and entered the enrollment data within Wiley College's systems and ensured that students received proper tutoring and career assistance. In addition, Ms. Lester ensured that assessment reporting was submitted to the proper agency in a timely fashion and that Wiley College complied with the applicable rules and regulations. Ms. Lester also worked with the Executive Director to execute the operational functions.

8. For context, Wiley College is a private historically Black college in Marshall, Texas. As a college that enrolls more than 1,000 students, Wiley College participated in the Second Chance Pell Program. The Second Chance Pell Program was established to provide Pell Grants to incarcerated individuals and to allow them to participate in postsecondary education programs. The Second Chance Pell Program was later expanded. As part of the expansion, selected colleges and universities partnered with federal and state penal institutions across the country to enroll thousands of incarcerated students in educational and training programs. The vast majority of selected schools are public two- and public four-year institutions like Wiley College. Moreover, twenty four of the newly selected

educational institutions, including Wiley College, are HBCUs and minority-serving institutions. The Second Chance Pell Program is incredibly important because it enables incarcerated individuals to qualify for a "fresh start." Indeed, providing education in prison reduces recidivism rates and is associated with higher employment rates, which will improve public safety and allow individuals to return home to their communities and contribute to society. Because of the program, students have earned over 7,000 credentials and have been able to develop new skills and improve their odds of success. Indeed, a 2018 study from the RAND Corporation ("RAND") found that incarcerated individuals who participated in correctional education were 48% less likely to return to prison within three years than incarcerated individuals who did not participate in any correctional education programs. RAND also estimated that for every dollar invested in correctional education programs, four to five dollars are saved on three-year re-incarceration costs. In all, the Second Chance Pell Program provides second chances to many people in need and opening many more doors of opportunities for incarcerated people. Wiley College contracts with the federal government to obtain financial aid for its students. Indeed, more than half of the students at Wiley College receive Pell Grants. More specifically, Wiley College was enrolled in the federal government's Second Chance Pell Program.

9.  During the course of Ms. Lester's employment, Ms. Lester took several actions in furtherance of an action under the False Claims Act. Ms. Lester also took other efforts to stop one or more violations of 31 U.S.C. 3730(h) and the False Claims Act, including 31 USCS § 3721.

10. Specifically, Ms. Lester repeatedly reported that the Second Chance Pell Program was not being handled properly and that funds were being misused. For example, beginning in the Fall 2022 school semester, Ms. Lester discovered that the students' tablets were defective. Indeed, Ms. Lester received complaints that many of the tablets failed to turn on or work at all. Accordingly, many of the students were unable to receive nor complete their schoolwork for several months. Ms. Lester reported this issue to Dr. Timothy Johnson (Executive Director of Extended Education). Ms. Lester also reported that many of the Second Chance Pell Program students were not even enrolled in classes, even though they were paying for the classes.

11. Instead of remedying the problem, Dr. Johnson ignored Ms. Lester's complaints and told Ms. Lester that the school "could not afford" dropping the Second Chance Pell Program students. Put differently, even though the students were not actually receiving the education they paid for, Dr. Johnson insisted that they remain enrolled. In all, Ms. Lester disclosed this evidence of gross mismanagement of the Second Chance Pell Program, gross waste of Federal funds that were provided for the Second Chance Pell Program, abuse of authority relating to the Second Chance Pell Program, and violations of laws, rules, or regulations. During the Spring 2023 school semester, Ms. Lester reported that the "Spring Term 1" classes were not accessible on the students' tablets – similar to the issue the students faced in the Fall 2021 semester. Because the Second Chance Pell Program provided an online education, the ability to access information via tablet was incredibly important for the incarcerated students.

12.     That same semester, Wiley College began sending assignments in paper format to the prisons for students who were enrolled in the Second Chance Pell Program. However, the incarcerated students were still unable to complete their work. Moreover, instead of providing paper assignments, Wiley College should have provided the electronic tablets in light of the curriculum and the students' location. As the Coordinator for Distance and Adult Education, Ms. Lester understood that the students' inability to complete their coursework would result in the students' failing their classes and/or being kicked out of the program. On February 10, 2023, after Dr. Johnson had not remedied the problems, Ms. Lester requested a meeting with Dr. Taisha Bradley, Wiley College's Chief Operating Officer/VP of Administration. During the meeting, Ms. Lester reported Wiley College's gross mismanagement of the Second Chance Pell Program, gross waste of Federal funds for the Second Chance Pell Program, abuse of authority relating to the Second Chance Pell Program, and violations of law, rules, and regulations related to the Second Chance Pell Program. Indeed, Ms. Lester reported that Wiley College was engaging in practices that resulted in depriving students who were enrolled in the Second Chance Pell Program a proper education.

13.     Ms. Lester also expressly warned that Wiley College's practices may result in the federal government's review of the misuse of the government-issued funds. Indeed, Ms. Lester warned Dr. Bradley that Wiley College's facility personnel would complain about the problems within the Second Chance Pell Program to the college's financial aid department and federal government. Thus, Ms. Lester reported to the required entities and individuals. In all, even though Wiley College received federal funds for the Second

Chance Pell Program, the students who were allegedly enrolled in the program were unable to complete work nor advance in their studies. In other words, Wiley College kept students on the list of enrollment, received federal funds, but did not provide the enrolled students the opportunity to complete their coursework. Thus, Ms. Lester had a reasonable belief that the information she was providing constituted Wiley College's gross mismanagement of the Second Chance Pell Program, gross waste of Federal funds for the Program, abuse of authority, and violations of law, rules, and regulations related to the Program.

14. Ms. Wiley made multiple reports to management officials and other employees of Wiley College, including but not limited to Dr. Howard O. Gibson (Vice President for Academic Affairs) and Dr. Stephanie Cox (Assistant Vice President of Academic Affairs). Only 6 days after Ms. Lester's meeting with Dr. Bradley, on or around February 16, 2023, Ms. Lester was removed and excluded from all communications. Indeed, on that date, Ms. Lester spoke with Dr. Johnson, who confirmed that Dr. Bradley had excluded Ms. Lester from an email regarding the Second Chance Pell Program. On or around that same day, Someeka Martin (Corrections Officer at Riverbend Detention Center) notified Ms. Lester via phone call that the Second Chance Pell Program was being shut down. Ms. Martin also asked Ms. Lester why she was not included in the Zoom meeting. Following the conversation, Ms. Martin forwarded Ms. Lester emails regarding the termination of the program. Indeed, Ms. Lester had not been included on these emails even though she was the Coordinator for Distance and Adult Education and was responsible for facilitating the management of the Second Chance Pell Program, nor was Ms. Lester notified about the program's termination by her superiors. See Exhibits A, B. Indeed, in the middle of the

school semester, Wiley College unilaterally terminated the Second Chance Pell Program instead of resolving Ms. Lester's concerns by ensuring that the Second Chance Pell Program students were afforded an education.

15.     In response to Ms. Lester's protected activity under 31 U.S.C. 3730(h) and the False Claims Act, Defendant terminated Ms. Lester a few months after she engaged in protected activity.  Indeed, on March 1, 2023, Krystal Moody (Wiley College's Human Resources Director) fired Ms. Lester. Further, Wiley College's alleged reason(s) for terminating Ms. Lester is a pretext. Indeed, the only reason Wiley College provided to Ms. Lester for her termination was that the college was "moving in another direction." Further, Wiley College informed the Texas Workforce Commission that part of the reason for the termination was that the Second Chance Pell Program was ending. These reasons are false and pretextual. First, as the Coordinator for Distance and Adult Education, Ms. Lester facilitated the management of multiple programs including the Organization Management Program and the Criminal Justice Administration Program. Thus, that Wiley College terminated the Second Chance Pell Program is of no moment. To be clear, the real reason Wiley College terminated Ms. Lester is because of her protected activity under the NDAA, including her reports about Wiley College's misuse of the Second Chance Pell Program funds. Wiley College's retaliation was designed to punish Ms. Lester for speaking up and deter others from reporting Wiley College's gross mismanagement of a Federal contract or grant, gross waste of Federal funds, abuse of authority relating to a Federal contract or grant, and a violation of law, rules, or regulations related to a Federal contract or grant.  As a result of Wiley College's retaliation against Ms. Lester, Ms. Lester has suffered and will continue

to suffer financial hardship, and the permanent and irreversible damage to her professional reputation after a long and distinguished career.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

16. Under the National Defense Authorization Act (the "NDAA"), 41 U.S.C. § 4712, a person who believes that they have been subjected to a reprisal prohibited by that section, may submit a complaint to the Inspector General of the executive agency involved. A complaint must be brought within three years after the date on which the alleged reprisal took place. The Inspector General is then required to make findings regarding whether the claim is frivolous, fails to allege a violation of the prohibition in subsection (a), or has previously been addressed in another Federal or State judicial or administrative proceeding initiated by the complainant.

17. After receiving an Inspector General report pursuant to subsection (b), the head of the executive agency concerned shall determine whether there is sufficient basis to conclude that the contractor, subcontractor, grantee, subgrantee, or personal services contractor concerned has subjected the complainant to a reprisal prohibited by subsection (a) and shall either issue an order denying relief or take action under that statute. However, "[i]f the head of an executive agency issues an order denying relief under paragraph (1) or has not issued an order within 210 days after the submission of a complaint under subsection (b), or in the case of an extension of time under paragraph (b)(2)(B), not later than 30 days after the expiration of the extension of time, and there is no showing that such delay is due to the bad faith of the complainant, the complainant shall be deemed to have exhausted all administrative remedies with respect to the complaint, and the complainant

may bring a de novo action at law or equity against the contractor, subcontractor, grantee, subgrantee, or personal services contractor to seek compensatory damages and other relief available under this section in the appropriate district court of the United States, which shall have jurisdiction over such an action without regard to the amount in controversy."

18. Lester filed a written Whistleblower Complaint to the Office of Inspector General of the U.S. Department of Health and Human Services on May 24, 2023. In that Charge, and any amendments and/or attachments thereto, Lester has asserted that Defendant discriminated and retaliated against her because of her reports protected by 41 U.S.C. § 4712. To date, neither the OIG nor the head of an executive agency has not issued an order granting or denying relief. Because it has been more than 210 days after the submission of her complaint, Ms. Lester has complied with the administrative obligation under 41 U.S.C. § 4712 and this Court has jurisdiction under 41 U.S.C. § 4712(C)(2).

### FIRST CAUSE OF ACTION:
### UNLAWFUL RETALIATION IN VIOLATION OF 41 U.S.C. § 4712

19. Ms. Lester was an employee of Wiley College– a grantee or contractor of the federal government. Specifically, Wiley College received payment under the Pell Grant Second Chance program.

20. Lester engaged in protected activity by reporting information that she reasonably believed was evidence of gross mismanagement of a federal contract, abuse of authority relating to a federal contract, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a federal contract.

21. Wiley College knew or was reasonably on notice that Lester engaged in that protected activity. And in response, Wiley College terminated Lester because of her protected activity. There is a causal connection between the protected activity and the adverse action, meaning the protected activity was a contributing factor in the adverse action.

22. As a direct and proximate result of Defendant's willful, knowing, and intentional discrimination and retaliation against her, Lester has suffered and will continue to suffer pain and suffering, and extreme and severe mental anguish and emotional distress. Lester is thereby entitled to general, compensatory, and punitive damages in amounts to be proven at trial.

23. Defendant additionally knew that it was unlawful to retaliate against Ms. Lester, yet intentionally chose to retaliate against her. Therefore, Defendant acted with malice in its termination of Lester.

24. The above-described acts on Defendant's part were undertaken in violation of 41 U.S.C. § 4712 and proximately caused Lester's substantial injuries and damages.

**SECOND CAUSE OF ACTION: FALSE CLAIMS ACT 31 U.S.C. §3730(h)**

25. Through the acts described above, Defendant fired Ms. Lester as a result of Lester's conduct of reporting false claims to her supervisors in a position of authority and thereby assisting an investigation of the false claims filed by the defendant. Ms. Lester also expressly warned that Wiley College's practices may result in the federal government's review of the misuse of the government-issued funds. Indeed, Ms. Lester warned Dr. Bradley that Wiley College's facility personnel would complain about the problems within

the Second Chance Pell Program to the college's financial aid department and federal government. Defendant's conduct was in violation of the federal False Claims Act whistleblower protection provision, 31 U.S.C. 3730(h).

26. Ms. Lester's reports regarding the Second Chance Pell Program reasonably could have led to an FCA action. Indeed, the Second Chance Pell Program is a federally-funded program. Lester had a reasonable belief that the information she was providing constituted Wiley College's gross mismanagement of the Second Chance Pell Program, gross waste of Federal funds for the Program, abuse of authority, and violations of law, rules, and regulations related to the Program.

27. Ms. Lester was terminated by Wiley College. Ms. Lester would not have experienced her termination "but for" her engaging in a protected activity. And a causal link exists between the protected activity and the adverse employment action.

28. As a result of Defendant's actions, Ms. Lester has been damaged through loss of employment, loss of wages, humiliation, and emotional distress.

## RESULTING LEGAL DAMAGES

29. Ms. Lester is entitled to the actual damages resulting from Defendant's violations of the law. Defendant's retaliatory and discriminatory discharge of Ms. Lester entitles her to actual damages, punitive damages, mental anguish, pain and suffering, exemplary damages, attorney's fees and other penalties provided by law.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Ms. Lester respectfully requests that he have judgment against Defendant for legal damages in excess of the minimum

jurisdictional limits of this Court, pre- and post-judgment interest as allowed by law, costs of suit, and all other relief, at law or in equity, to which Ms. Lester may be entitled.

Respectfully submitted,

**DOYLE DENNIS LLP**

_____
MICHAEL PATRICK DOYLE
State Bar No. 06095650
PATRICK M. DENNIS
State Bar No. 24045777
JEFFREY I. AVERY
State Bar No. 24085185
EMMA R. BROCKWAY
State Bar No. 24125156
3401 Allen Parkway, Suite 100
Houston, Texas 77019
Phone: 713.571.1146
Fax:   713.571.1148
service@doylelawfirm.com
**ATTORNEYS FOR PLAINTIFF**

## JURY DEMAND

*Plaintiff hereby demands a trial by jury, a right enshrined in the Constitution of the United States of America and of the State of Texas and preserved by the sacrifices of many.*

_____
MICHAEL PATRICK DOYLE