IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| KAREN LESTER | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | Case No. 2:23-cv-00624-RWS-RSP |
| | § | |
| WILEY COLLEGE, | § | |
| | § | |
| *Defendant.* | § | |

---

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

---

Michael J. DePonte
State Bar No. 24001392
michael.deponte@jacksonlewis.com
Avvennett Gezahan
State Bar No. 24099895
avvennett.gezahan@jacksonlewis.com
JACKSON LEWIS P.C.
500 N. Akard, Suite 2500
Dallas, Texas 75201
T: (214) 520-2400
F: (214) 520-2008

**ATTORNEYS FOR DEFENDANT**

## TABLE OF CONTENTS

Table of Contents ................................................................................................................. i
Table of Authorities ............................................................................................................ ii
Wiley College's Motion for Summary Judgment and Brief in Support ............................. 1

I.      STATEMENT OF THE ISSUES TO BE DECIDED ................................................ 1

II.     SUMMARY OF ARGUMENT .............................................................................. 2

III.    STATEMENT OF UNDISPUTED MATERIAL FACTS ......................................... 3
        A.   Wiley's Partnership with the Department of Education. ............................. 3
        B.   Lester's Employment with Wiley. ............................................................... 5
        C.   Lester's Complaints Against Her Immediate Supervisor. ........................... 6
        D.   The Louisiana Department of Public Safety and Corrections Ends Its Partnership
             with Wiley. ................................................................................................ 7
        E.   Wiley Terminates Lester's Employment on March 1, 2023. ....................... 8
        F.   Wiley's Annual Financial Audits ............................................................... 9

IV.     SUMMARY JUDGMENT STANDARD ................................................................ 10

V.      ARGUMENT AND AUTHORITIES ..................................................................... 11
        A.   Wiley Did Not Violate The Anti-Retaliation Provision Of The National Defense
             Authorization Act Against Lester Because Wiley Terminated Her Employment
             Due To The Program Ending. .................................................................. 11
             1.   Legal Standard for Proving Retaliation in Violation of the National
                  Defense Authorization Act. .............................................................. 11
             2.   Lester's claim of retaliation in violation of the National Defense
                  Authorization Act fails because her alleged reports of devices not
                  working properly was not a contributing factor in her discharge. ....... 12
             3.   Wiley would have taken the same action of terminating Lester's
                  employment despite her reporting complaints of defective devices. ...... 14
        B.   Wiley Did Not Violate The Federal False Claims Act Whistleblower Protection
             Provision Against Lester Because Wiley Terminated Her Employment Due To
             The Program Ending. .............................................................................. 16
             1.   Legal standard for proving retaliation in violation of the False Claims Act. ... 16
             2.   Lester cannot establish a causal connection between her reporting claims
                  of defective devices and Wiley terminating her employment. ............... 17
             3.   Wiley had a legitimate, non-retaliatory reason for terminating Lester's
                  employment ..................................................................................... 18

VI.     CONCLUSION AND PRAYER .......................................................................... 19

Certificate of Service .......................................................................................................... 20
Appendix of Exhibits in Support of Defendant's Motion for Summary Judgment ............ 21

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ameristar Jet Charter, Inc. v. Signal Composites, Inc.*,
   271 F.3d 624 (5th Cir. 2001) .............................................................................. 10

*Anderson v. Liberty Lobby, Inc.*
   477 U.S. 242 (1986) ................................................................................... 10, 11

*Carr v. SSA*,
   185 F.3d 1318 (Fed. Cir. 1999) ..................................................................... 12, 15

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ......................................................................................... 10

*Chambers v. Department of the Interior*,
   515 F.3d 1362 (Fed. Cir. 2008) ........................................................................ 12

*Diaz v. Kaplan Higher Educ., L.L.C.*,
   820 F.3d 172 (5th Cir. 2016) ....................................................................... 16, 17

*Feist v. Louisiana, Department of Justice, Office of the Attorney General*,
   730 F.3d 450 (5th Cir. 2013) ............................................................................ 17

*Fuerst v. Hous. Auth. of the City of Atlanta*,
   38 F.4th 860 (11th Cir. 2022) .......................................................................... 12

*Garcia v. Penske Logistics, L.L.C.*,
   631 Fed. Appx. 204 (5th Cir.2015) ................................................................... 18

*Garcia v. Prof'l Contract Servs.*,
   938 F.3d 236 (5th Cir. 2019) ............................................................................ 17

*United States ex rel. King v. Solvay Pharm., Inc.*,
   871 F.3d 318 (5th Cir. 2017) ............................................................................ 16

*Lyons v. Katy Indep. Sch. Dist.*,
   964 F.3d 298 (5th Cir. 2020) ............................................................................ 10

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ......................................................................................... 10

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)16

*Monden v. Consol. Nuclear Sec., L.L.C.*,
   No. 23-10553, 2024 U.S. App. LEXIS 5740 (5th Cir. 2024) ...................... 11, 12, 14

*Royal v. CCC & R Tres Arboles, L.L.C.*,
   736 F.3d 396 (5th Cir. 2013) .................................................................. 10

*Swanson v. Gen. Servs. Admin.*,
   110 F.3d 1180 (5th Cir. 1997) ............................................................... 17

*Tex. Educ. Agency v. U.S. Dep't of Educ.*,
   992 F.3d 350 (5th Cir. 2021) .................................................................. 11

*United States ex rel. Toledo v. Hca Holdings, Inc.*,
   2023 U.S. App. LEXIS 8368. (5th Cir. Apr. 7, 2023) ..12

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
   570 U.S. 338, 133 S. Ct. 2517 (2013) .................................................... 17

**Statutes**

5 U.S.C. § 1221(e) ..................................................................................... 11

31 U.S.C. 3730(h) ..................................................................................... 16

31 U.S.C. §§ 3729 - 3733 ............................................................................ 1

31 U.S.C. § 3730(h)(1) .............................................................................. 16

41 U.S.C. § 4712 ................................................................................... 1, 11

41 U.S.C. § 4712(a)(1) .............................................................................. 12

Federal False Claims Act ................................................................... 1, 2, 3, 16

FCA ............................................................................................... *passim*

National Defense Authorization Act ....................................... 1, 2, 3, 11, 12

National Defense Authorization Act of 2013 ........................................... 11

NDAA ............................................................................................. *passim*

**Other Authorities**

FED. R. CIV. P. 56(a) ................................................................................ 10

Federal Rules of Civil Procedure 56 ....................................................... 10

https://www.wileyc.edu/about-wiley-university ....................................... 3

Defendant Wiley College ("Wiley" or "College") submits this Motion for Summary Judgment and Brief in Support, and moves for the dismissal of Plaintiff Karen Lester's claims in their entirety as follows:

## I.  STATEMENT OF THE ISSUES TO BE DECIDED

This is an employment dispute in which Lester claims Wiley retaliated against her when the College terminated her employment as the Program Coordinator for Extended Education at Wiley. Specifically, Lester asserts claims for retaliation in violation of 41 U.S.C. § 4712 (the "National Defense Authorization Act" or the "NDAA") and 31 U.S.C. §§ 3729 - 3733 (the "False Claims Act" or the "FCA"). Lester believes her complaints informing her supervisors of the mismanagement of Second Chance Pell ("SCP") program funds drove the decision to terminate her employment; she is incorrect.  The deposition testimony and documents produced in this case establish Wiley's legitimate non-retaliatory business reasons for terminating Lester's employment and the College's decision to terminate Lester's employment was entirely unrelated to her complaints.

Wiley asserts to the Court, summary judgement on Lester's retaliation claim in violation of NDAA is appropriate as the records reveals that: (1) Lester's protected disclosure was not a "contributing factor" to Wiley terminating her employment; (2) Lester's reported complaint was widely known by Wiley prior to Lester starting her employment with Wiley; (3) the ending of the SCP program was the sole reason for Lester's termination; and (4) Wiley terminated a similarly situated employee, who had not filed a complaint, as a result of the SCP program ending.  Based on these issues before the Court, there is no evidence that Wiley terminated Lester's employment due to her complaint in violation of the NDAA.

Likewise, Wiley asserts that Lester's retaliation claim under the FCA fails because: (1) Lester reported her first complaint regarding the SCP program four years before her termination of employment, and therefore there is a lack of any temporal proximity to her discharge; and (2) Wiley terminated Lester's employment only after the Louisiana Department of Public Safety & Corrections ended its SCP program partnership with Wiley; that is, Lester's claims lack any causal nexus to the termination of her employment.   Accordingly, summary judgment is appropriate on Lester's claims of FCA retaliation claim.

## II.    <u>SUMMARY OF ARGUMENT</u>

Lester's retaliation claims are nothing more than futile attempts to cast doubt on Wiley's reasoning for terminating her employment. The unrefuted evidence establishes that – despite her complaints that the tablets Wiley purchased for the students in the SCP program were "not working correctly" – Wiley was aware, prior to her employment, that the tablets had software and connectivity issues – issue which it worked to address.

There is no dispute that Lester did not work in Wiley's Financial Aid Department or have knowledge on how financial aid funds were disbursed or managed to SCP students. Lester's verbal complaints to her supervisors regarding the SCP program were limited to the "devices" not working correctly. In fact, Lester never complained that Wiley mismanaged federal funds until after her termination. Despite Wiley's legitimate decision to terminate her employment, Lester nevertheless alleges that Wiley terminated her employment in retaliation for complaining of mismanagement of federal funds.

As discussed in more detail below, Lester cannot establish a *prima facie* case of retaliation in violation of the National Defense Authorization Act or the False Claims Act because her alleged report of a known fact – devices occasionally glitching – was not a contributing factor in her

discharge. Rather, Wiley terminated Lester's employment for the legitimate non-retaliatory reason that the SCP program, which was over 80 percent of Lester's work, ended. Lester cannot present any admissible or proper evidence, outside of her subjective belief, to maintain her claims.

Therefore, Wiley requests the Court grant its Motion for Summary Judgment in its entirety.

## III. STATEMENT OF UNDISPUTED MATERIAL FACTS

The deposition excerpts and exhibits relied upon by Wiley and referenced herein are contemporaneously submitted to the Court as part of Wiley's Appendix in Support of its Motion for Summary Judgment.[1]

### A. Wiley's Partnership with the Department of Education.

Wiley College is a historically black college located in Marshall, Texas. (App. 44, Felton Dep. at 54:15-17; App. 79, Lester Dep. at 32:2-5). At reflected in the College's Vision Statement, "Wiley University is a nationally recognized liberal arts college serving as a beacon of light inspiring individuals to serve as catalysts of social change in their community and professions."[2]

In 2015, the U.S. Department of Education created an experimental initiative called the Second Chance Pell Grant Program that, in part, allowed incarcerated individuals in state prisons to continue their secondary education. (App. 19, Buttross Dep. at 9:4-7). Incarcerated individuals that met Financial Aid's requirements were provided with Pell grants to pay for their continued education. *Id*. To participate in the program, colleges and universities applied through the U.S. Department of Education to be an administrator of the SCP program and partner with local prisons to teach college courses to inmates. (App. 19, Buttross Dep. at 9:8-14).

---

[1]     Citations in the form "App." followed by a number refer to the consecutively paginated pages of the accompanying appendix.

[2]     https://www.wileyc.edu/about-wiley-university. Last visited April 10, 2025.

The Department of Education expected selected colleges and universities to routinely visit the prisons to provide students, part-time or full-time students, with basic college services. (App. 20, Buttross Dep. at 11:2-8). As a requirement of the program, the educational institutions provide and paid for devices for each student enrolled in the SCP program (App. 20, Buttross Dep. at 11:9-10), while the prisons stored the devices in their facilities. (App. 87, Lester Dep. at 55:7-13).

In 2016, Wiley applied for the SCP program and the U.S. Department of Education approved the College to become a SCP partner. (App. 8, Andrus Dep. at 6:5-11). Wiley partnered with three prisons in Louisiana including: Raymond Laborde, David Wade, and Lake Providence. (App. 74, 75, Lester Dep. at 12:19-22; 13:1-5). Wiley thereafter provided tablets to each of its partnered prisons with the American Prison Data System Software installed which allowed students to receive their coursework and assignments through the tablets. (App. 8, Andrus Dep. at 24:3-10). Wiley also contracted with American Prison Data System to use their platform to upload course curriculum, service broken tablets, and troubleshoot software issues. (App. 8, 9, Andrus Dep. at 24:14-20; 24:21-25; 25:2-19:).[3]

Between 2018 and 2019, Wiley's professors and administrators periodically visited each prison to assist potential students in applying for financial aid and engage with the students in an in-person setting.  (App. 7, Andrus Dep. at 13:7-13). Wiley vetted each potential student's financial aid forms to ensure the forms complied in accordance with the U.S. Département of Education's requirements. Wiley's Executive Director of the Second Chance Pell Program Dr. Tracy Andrus

---

[3]    Prior to 2018, Wiley encountered issues with the tablets breaking, curriculum not populating, and other glitches with the tablets. (App. 9, 10, Andrus Dep. at 25:14-17; 25:20-25-26:2). Further, certain prisons had internal internet connection issues that prevented students from accessing coursework from ADPS' platform. (App. 28, 29, Buttross Dep. at 40:25; 41:1-25).  Indeed, since the inception of Wiley's participation in the SCP program, the prisons, Louisiana Department of Public Safety and Corrections, and Wiley were aware of the periodic connectivity and software issues with the tablets.

("Dr. Andrus") would then send all completed financial aid applications to Wiley's Registrar to enroll the students in classes. (App. 88, Lester Dep. at 58:14-19).

**B.    Lester's Employment with Wiley.**

On September 10, 2018, Wiley hired Lester as a Program Coordinator, Second Chance Pell. (App. 80, Lester Dep. at 45:4-18; App. 108-109, Lester Exhibit 2). In 2019, Lester's job position changed to include Program Coordinator, Second Chance Pell and Extended Education. (App. 81, 82, Lester Dep. at 46:7-12; 47:9-16). As the Program Coordinator, Second Chance Pell, Lester was responsible for addressing and informing her supervisor of students concerns, ensuring curriculum was properly uploaded to the ADPS platform, confirming completed documents were sent and received from the prisons, and communicating with prison staff and Wiley's liaison. (App. 83, Lester Dep. at 48:6-12). As a Program Coordinator, Lester was not involved in the management, disbursement, or reimbursement of financial aid funds to students in the SCP program. (App. 94, 95, 96, Lester Dep. at 68:20-25-69:1-6; 70:14-21). In 2018, Lester reported to Dr. Tracy Andrus ("Dr. Andrus"). Lester was responsible for overseeing about 100 students between the SCP program and Adult Education program. (App. 76-77, Lester Dep. at 13:22-14:1). On average, there were about 84 students in the SCP program, between the three prisons, and there were about 16 or 17 students in the Adult Program. (App. 76, Lester Dep. at 13:16-21). Accordingly, the majority of Lester's day-to-day workload centered around the SCP program. (App. 84, Lester Dep. at 50:11-14).

During her tenure, Lester became aware of the issues already known to Dr. Andrus - that the prisons were experiencing issues with the tablets. (App. 86, Lester Dep. at 54:19-22). Specifically, the curriculum was not consistently populating on ADPS' platform. (App. 86, Lester Dep. at 54:19-22). In 2019, Lester first informed Dr. Andrus, who was already aware of and

addressing, issues with the platform.[4] During her employment with Wiley, Lester made no other complaints concerning the SCP program. (App. 97, Lester Dep. at 71:1-4; App. 134, Moody Dep. at 31:4-10).

### C.    Lester's Complaints Against Her Immediate Supervisor.

In 2022, Dr. Johnson became the Executive Director of the Second Chance Pell Program and Lester's immediate supervisor. (App. 78, Lester Dep. at 25:6-9).  On March 15, 2022, Lester reported to Wiley's Chief Human Resources Officer, Krystal Moody ("Moody") that Johnson had acted unprofessionally. (App. 98-99, Lester Dep. at 77:25-78:1-14; App. 111-113, Exhibit 5). Specifically, Lester claimed Dr. Johnson, at various time, yelled at her in the workplace, made comments about her job being in jeopardy, and humiliated her in front of others. (App. 111-113, Lester Dep. at Exhibit 5). Notably, Lester's written complaint did not state Dr. Johnson, or any other individual misused federal funds related to any federal Pell Grant program including the SCP program. (App. 99, 100, Lester Dep. at 78:21-24; 79:10-12).

In May 2022, Lester filed another report against Dr. Johnson regarding his alleged incivility. (App. 135, Moody Dep. at 41:15-17). Dr. Johnson, Dr. Howard Gibson, and Moody met with Lester who raised concerns of Dr. Johnson raising his voice at her, cursing at her, and sending an email from her email account without her authorization.  (App. 138, Moody Dep. at 46:7-17). They further met with Lester to discuss that she had not followed the College's grievance policy. (App. 135, 137, Moody Dep. at 41:19-25; 44:8-13).

In the meeting, Dr. Johnson agreed his behavior could be perceived as inappropriate and he apologized. (App. 135, Moody Dep. at 41:22-25). Lester accepted Dr. Johnson's apology, and

---

[4]    Between 2019-2022, Lester claims she made the same known complaints of the tablets not populating coursework to her supervisors to include: (1) Dr. Andrus, (2) Mr. Javan Reed, (3) Dr. Todd, (4) Dr. Miles, and (5) Dr. Timothy Johnson.  (App. 85, 86, Lester Dep. at 53:10-19; 54:15-22).

they continued to work together. (App. 136, Moody Dep. at 42:15-17). Lester put her grievance on hold as Moody was monitoring Dr. Johnson's behavior. (App. 138, Moody Dep. at 46:21-23). From May 2022 to March 1, 2023, Lester did not file any other complaints against Dr. Johnson (App. 138, 139, Moody Dep. at 46:24-25; 47:1-3) or make other complaint to Moody concerning the SCP program. (App. 139, Moody Dep. at 47:4-6).

### D. The Louisiana Department of Public Safety and Corrections Ends Its Partnership with Wiley.

On February 6, 2023, the Louisiana Department of Public Safety and Corrections sent a letter to Wiley ending its partnership with the College and the SCP program. (App. 37, Felton Dep. at 11:6-14; App. 55-56, Exhibit 4). The Louisiana Department of Public Safety and Corrections' letter addressed eight issues concerning Wiley's performance in the program – but none of the eight issues accused Wiley of mismanaging federal funds or that Wiley failed to provide electronic devices. (App. 37, 38, Felton Dep. at 11:15-12:2, App. 55-56, Exhibit 4). Deputy Assistant Secretary Andrea Buttross wrote the letter ending Wiley's partnership with the Louisiana prisons for lack of communication with staff and students, failure to attend monthly meetings, delays in coursework being provided to students, incorrect reporting of students' transcripts, failing to notify students of changes to degree plans, unavailable classes for students, delays in deploying laptops, and ensuring documentation complied with the Department of Education's funding deadlines. (App. 21, 22-23, 24, 25, 26, 27, Buttross Dep. at 17:9-12; 19:5-20:2; 20:6-17; 21:1-15; 22:23-25; 23:21-25; 24: 1-9).[5]

---

[5]    Louisiana Department of Correction Director of Education Muriel Leewright's ("Leewright") incorrectly opines that Wiley committed fraud by not providing students with certain courses, ensuring coursework was uploaded to the devices, or ensuring transcripts were accurate. (App. 64, Leewright Dep. at 23:3-14). However, Leewright's opinion lacks foundation, or any basis, as she has no knowledge of Wiley misusing federal funds and, notably, she failed to report her unfounded beliefs of fraud to Wiley's administrators or other authority. (App. 64, 65, Leewright Dep. at 23:3-7; 23:15-19; 23:22-23; 24:2-17).

For the entirety of Wiley's participation in the SCP program, there was only one reported incident that Wiley received Pell grant funds for a student who was not enrolled in the program. (App. 62, Leewright Dep. at 19:14-16). Wiley returned the student's Pell grant funds once it was made aware of the incident. (App. 66, Leewright Dep. at 25:17-20; App. 42, Felton Dep. at 30:5-9).

**E.    Wiley Terminates Lester's Employment on March 1, 2023.**

On February 10, 2023, following the Louisiana Department of Public Safety and Correction's termination of its partnership with Wiley, Lester requested a meeting with Vice President of Administration Dr. Tashia Bradley to discuss her grievances about Dr. Johnson and the SCP program. (App. 103, Lester Dep. at 97:8-17). During the meeting, Lester informed Dr. Bradley that students complained that coursework was not populating on their devices and Dr. Johnson was not responding to emails. (App. 92, 93, Lester Dep. at 64:23-25; 65:1-10). In late February 2023, Leewright received a close out plan to wind down the SCP program from Dr. Bradley. (App. 63, Leewright Dep. at 22:3-6). Dr. Bradley's close out plan indicated that Wiley would close out the SCP program sometime in March 2023. (App. 63, Leewright Dep. at 22:7).

With the SCP program ending, Lester's workload decreased by over 80 percent. (App. 76, 84, Lester Dep. at 13:16-21; 50:11-14). Accordingly, on March 1, 2023, Wiley discharged Lester due to the termination of the Wiley's SCP program. (App. 39, Felton Dep. at 17:15-19; App. 133, Moody Dep. at 23:21-25).

On March 15, 2023, Moody responded to Lester's unemployment claims with the Texas Workforce Commission. At the time, Moody stated that Lester was laid off because Wiley did not know if they were going to keep a position to administer the College's Adult Education program. *See App. 143-144, the Texas Workforce Commission Certification dated October 23, 2024.* That is, with the termination of the SCP program, Wiley had not determined if it needed a Program

Coordinator for the 16 to 17 remaining students as the few remaining duties for that position had been assumed by Dr. Johnson and then Dr. Scales. (App. 140, 141, Moody Dep at. 48:21-25; 49:1-8).[6]

F.   **Wiley's Annual Financial Audits**

Significantly, Wiley hires an independent auditor to review all federal financial aid and funding received by the institution, which includes the SCP, loans, subsidized or unsubsidized, Parent Plus loans, and Pell grants. (App. 41, Felton Dep. at 28:14-24).[7]  The findings from the independent audit are sent to the Department of Education and the Southern Associations for Colleges and Schools - Wiley's accrediting body. (App. 46, Felton Dep. at 60:11-18). If the independent auditor determines that Wiley misappropriated federal funds, Wiley would not be awarded federal funds for the next year. (App. 48, Felton Dep. at 62:5-13).[8]  Lester was not involved in the audit process or in auditing Wiley's financials. (App. 104, Lester Dep. at 98:16-24).

One task of the independent auditor is to investigate whether Wiley received financial aid funding for a student not enrolled in any Wiley program. (App. 47, Felton Dep. at 61:6-11). While, in 2018 and before Wiley employed Lester, the audit revealed that Wiley had received federal funds for one or two students who were not enrolled in a program, Wiley returned those federal dollars as soon as it became aware of the issue. (App. 48,42, Felton Dep. at 62:1-4; 30:5-9).  Since March 2018, Wiley has not had any issues with reconciliation of students being disbursed financial aid funds that were not enrolled in the SCP program. (App. 47-48,42, Felton Dep. at 61:19-62:4;

---

[6]     In May 2023, Wiley also terminated Dr. Johnson's employment as a result of the SCP program ending. (App. 141, Moody Dep. at 49:1-15; App. 43, Felton Dep at. 41:16-21).
[7]     The US Department of Education requires institutions receiving federal funds to submit to annual audits. (App. 41, Felton Dep. at 28:4-7).
[8]     About 90 percent of students attending Wiley receive financial aid. (App.48, Felton Dep. at 62:16-22).

30:5-9).  The U.S. Department of Education has not contacted the Louisiana Department of Public Safety and Corrections investigating Wiley for the misuse of federal funds. (App. 66, Leewright Dep. at 25:10-16). Wiley has not been investigated by the U.S. Department of Education for misappropriation of federal funds (App. 48, 49, Felton Dep. at 62:23-25; 63:1-5).

## IV.    SUMMARY JUDGMENT STANDARD

Federal Rules of Civil Procedure 56 mandates that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A material fact is a fact that is identified by applicable substantive law as critical to the outcome of the suit.  *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986); *Ameristar Jet Charter, Inc. v. Signal Composites, Inc.,* 271 F.3d 624, 626 (5th Cir. 2001).  To be genuine, the dispute regarding a material fact must be supported by evidence such that a reasonable jury could resolve the issue in favor of either party. *See Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013). When a defendant moves for summary judgment on a plaintiff's causes of action, it need only point to the absence of evidence supporting one or more elements of her claims. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986); *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 301-02 (5th Cir. 2020).

Once the movant meets its burden of showing no genuine dispute of material fact exists, the burden shifts to the non-movant to prove with affirmative evidence "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986). To meet this burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the non-movant must provide significant probative evidence that would enable a jury to return a verdict in the non-movant's favor.

*Anderson*, 477 U.S. at 256-57. Lester's burden is not satisfied by unsubstantiated assertions, unsupported speculation, or mere allegations. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). As discussed below, Wiley is entitled to summary judgment on Lester's claims.

## V.    ARGUMENT AND AUTHORITIES

### A.    Wiley Did Not Violate The Anti-Retaliation Provision Of The National Defense Authorization Act Against Lester Because Wiley Terminated Her Employment Due To The Program Ending.

Lester alleges Wiley retaliated terminated her employment after she reported the College for gross mismanagement of federal funds in violation of 41 U.S.C § 4712.  For the reasons herein, Lester's retaliation claim cannot survive summary judgment.

### 1.    Legal Standard for Proving Retaliation in Violation of the National Defense Authorization Act.

The National Defense Authorization Act of 2013 ("NDAA") prohibits any recipient of federal dollars from retaliating against whistleblowers who report an abuse of that money. 41 U.S.C. § 4712; see *Tex. Educ. Agency v. U.S. Dep't of Educ*., 992 F.3d 350, 353 (5th Cir. 2021).

> "An employee of a contractor, subcontractor, grantee, subgrantee, or personal services contractor may not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing to a person or body. . . information that the employee reasonably believes is evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a Federal contract  (including the competition for or negotiation of a contract) or grant." 41 U.S.C. § 4712(a)(1).

The NDAA incorporates 5 U.S.C. § 1221(e), which requires a plaintiff to prove: (1) while she was employed by a government contractor, she disclosed information that she reasonably believed was evidence of "gross mismanagement" of a federal contract or grant to someone with responsibility to investigate, discover, or address misconduct; and (2) the protected disclosure was a "contributing factor" to the adverse employment action. *Id; see Monden v. Consol. Nuclear Sec.,*

*L.L.C.*, No. 23-10553, 2024 U.S. App. LEXIS 5740, at *6 (5th Cir. 2024).  A protected activity is disclosing information that is reasonably believed to be evidence of a "gross mismanagement of a Federal contract ... , a gross waste of Federal funds ... , or a violation of law, rule, or regulation related to a Federal contract." 41 U.S.C. § 4712(a)(1).

If the employee establishes a *prima facie* case, the employer can then demonstrate, by clear and convincing evidence, that it would have taken the same personnel action despite the protected activity." *Monden* at 5740, (citing 5 U.S.C. § 1221(e)).  Courts apply the "Carr factors" in determining whether the employer has met its burden. *Id*.  These factors include; the strength of the employer's evidence in support of its personnel action; the existence and strength of any motive to retaliate on the part of the employer's officials who were involved in the decision; and any evidence that the employer takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated. *Carr v. SSA*, 185 F.3d 1318, 1323 (Fed. Cir. 1999).

### 2. Lester's claim of retaliation in violation of the National Defense Authorization Act fails because her alleged reports of devices not working properly was not a contributing factor in her discharge.

As an initial matter, Lester cannot establish she made any complaint regarding the "gross mismanagement" of a federal contract by Wiley.  Gross mismanagement is limited to "particularly egregious conduct - not run-of-the-mill policy disputes between managers and employees." *Fuerst v. Hous. Auth. of the City of Atlanta*, 38 F.4th 860, 873 (11th Cir. 2022).  Likewise, a gross waste of federal funds is "a more than debatable expenditure significantly out of proportion to the benefit reasonably expected to accrue to the government." *Chambers v. Department of the Interior*, 515 F.3d 1362, 1366 (Fed. Cir. 2008). Mere complaints regarding mistakes or computer glitches simply do not rise to the level of a protected activity, particularly when such issues were a part of the employee's job duties.  *See United States ex rel. Toledo v. Hca Holdings, Inc.*, 2023 U.S. App.

LEXIS 8368, *6. (5th Cir. Apr. 7, 2023) (citations omitted).  As applied to this matter, Lester's alleged complaints regarding tablet and data malfunctions, or an occasional error where an inmate was erroneously enrolled in a class before Wiley could return SCP funds, simply do not rise to the level of gross mismanagement, and no reasonable employee – particularly one responsible for the program – would believe Wiley had engaged in any misconduct or misappropriation.

Summary judgment on Lester's retaliation claim is appropriate because she cannot meet her burden of establishing a *prima facie* case. Specifically, Lester cannot establish the second element of her claim – that the protected disclosure was a "contributing factor" to the adverse employment action.

The core of Lester's allegation is that Wiley received federal funds for the Second Chance Pell Program but that students were not receiving the benefits from the federal funds. (App. 92, Lester Dep. at 64:5-8.  However, the evidence affirmatively demonstrates that Wiley purchased the devices in 2018, prior to Lester's hire, and that Wiley was fully aware of the issues with tablets lagging, APDS' coursework issues,[9] and internet connectivity issues within the prisons. (App. 8, 9, 10, Andrus Dep. at 24:1-10; 25:20-25; 26:1-13).  In fact, Wiley's professors submitted their curriculum to APDS' technicians who would then upload the coursework on the tablets. (App. 8, Andrus Dep. at 24:11-20). Wiley also contracted with APDS to repair broken tablets and address software issues. (App. 8, 9, Andrus Dep. at 24:21-25; 25:12-19). Further, Buttross was aware that students located at David Wade prison dealt with internet connection issues as the prison was in a remote location where internet reception area was poor. (App. 29, Buttross Dep. at 41:17-21).

---

9    In fact, Lester's only complaint was when she allegedly informed Dr. Andrus, Mr. Reed, Dr. Todd, Dr. Miles, and Dr. Johnson that students in the SCP program were having issues with their coursework populating on their assigned devices. (App. 85, 86, 89, 90, 91, 92, Lester Dep. at 53:10-19; 54:15-22; 59:15-17; 62:23-25; 63:25; 64:1-8).  Lester testified she did not make any other complaints regarding the SCP program. (App. 97, Lester Dep. at 71:1-4).

Moreover, Lester's discharge lacks any temporal proximity to her alleged complaint. Indeed, the SCP program ended on February 6, 2023, **three to four years after** Lester made her initial report of the devices not consistently populating coursework. (App. 85, Lester Dep. at 53:10-14: App. 115-116, Exhibit 9). Lester also knew the SCP program was ending prior to the termination of her employment because the program comprised over 80 percent of her workload and responsibilities. (App. 101, Lester Dep. at 90:2-14). The recommendation for Lester's termination was based solely on the termination of the SCP program by Louisiana Department of Public Safety & Corrections. (App. 140, Moody Dep. at 48:11-14; App. 39, Felton Dep. at 17:13-15). In fact, Lester testified she had no involvement or knowledge of the disbursement or refund process of federal financial aid funds to students in the SCP program. (App. 94, 95, Lester Dep. at 68:20-25; 69:11-23). To this end, the first and only time Lester alleged being a whistleblower for mismanagement of federal funds was **after** the termination of her employment. (App. 102, 103, Lester Dep. at 96:23-25; 97:1-7).

Lester simply cannot establish a *prima facie* case of retaliation under the NDAA. Rather, her subjective belief that her reports regarding known issue with the tablets cannot support her NDAA retaliation claim.

### 3. Wiley would have taken the same action of terminating Lester's employment despite her reporting complaints of defective devices.

Even assuming *arguendo* Lester could establish a *prima facie* case of retaliation, which she cannot, there is no evidence that Wiley's decisionmakers into Lester's termination, had any retaliatory motive. *Monden* 5740, at *7 (5th Cir. 2024). Further, Wiley terminated Dr. Johnson, another employee who worked predominately with the SCP program, for the same reason Lester's employment was terminated – the lack of participation in the program.. *Id*.

14

As the evidence shows, Lester's termination of employment went through several decisionmakers, who did not supervise her work or to whom she reported her complaints. (App. 139, 140, Moody Dep. at 47:7-25; 48:1-10; App. 39, Felton Dep. at 17: 3-12). As noted above, Wiley terminated Lester's employment due to the program ending. (App. 140, Moody Dep. at 48:11-14; App. 39, Felton Dep. at 17:13-15). There is no evidence that Wiley's termination process or its decisionmakers, had any retaliatory motive.

Finally, Lester fails to identify any similar situated employee[10] who was not terminated due to the SCP program ending. *Carr,* 185 F.3d at 1326. In fact, Plaintiff cannot dispute Wiley evenhandedly terminated Dr. Johnson's employment as a result of the SCP program ending. (App. 141, Moody Dep at. 49:1-15; App. 43, Felton Dep at. 41:16-21). Dr. Johnson did not submit any complaints with his supervisor or other employees at Wiley regarding the SCP program. (App. 45, Felton Dep at. 59:11-15). Rather, Dr. Johnson was a part of Wiley's closeout plan to wind down the SCP program, completed in May 2023, after which Wiley terminated his employment. (App. 140, 141, Moody Dep at. 48:21-25; 49:1-8). The conclusion of the SCP program resulted in the same exact employment decision for Lester as Dr. Johnson – the termination of their employment. The clear and convincing evidence is that Wiley would have taken the same employment action against Lester. Accordingly, Lester's retaliation claim in violation of the NDAA must fail and should be dismissed.

---

[10] For an employee to be considered similarly situated to an individual who is disciplined, a plaintiff must show the conduct and the circumstances surrounding the conduct of the comparison employee are similar to those of the disciplined individual. *Id.*

**B.    Wiley Did Not Violate The Federal False Claims Act Whistleblower Protection Provision Against Lester Because Wiley Terminated Her Employment Due To The Program Ending.**

Lester next alleges Wiley terminated her employment as a result of her reporting false claims to her supervisor and Wiley's conduct was in violation of the Federal False Claims Act ("FCA") whistleblower protection provision, 31 U.S.C. 3730(h). For all the reasons stated herein, Lester's retaliation claim cannot survive summary judgment.

**1.    Legal standard for proving retaliation in violation of the False Claims Act.**

Section 3730(h) creates a cause of action for an employee, contractor, or agent who "is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and condition of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop one or more violations of this subchapter." 31 U.S.C. § 3730(h)(1).

An employee must establish the *prima facie* elements of an FCA retaliation claim by showing: (1) the employee engaged in protected activity; (2) the employer or the entity with which he has contracted or serves as an agent, knew about the protected activity; and (3) there was retaliation because of the protected activity." United States ex rel. Bias v. Tangipahoa Par. Sch. Bd., 816 F.3d 315, 323 (5th Cir. 2016); see *United States ex rel. King v. Solvay Pharm., Inc.,* 871 F.3d 318, 332 (5th Cir. 2017); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Once an employee establishes a *prima facie* case, "the burden shifts to the employer to state a legitimate, non-retaliatory reason for its decision. *Diaz v. Kaplan Higher Educ., L.L.C.,* 820 F.3d 172, 175 n.3 (5th Cir. 2016) (applying the "the *McDonnell Douglas* framework to the False Claims Act's anti-retaliation provision). After the employer states its reason, the burden shifts back to the employee to demonstrate that the employer's reason is actually

16

a pretext for retaliation." *Diaz*, 820 F.3d at 176 (quoting *LeMaire v. Louisiana*, 480 F.3d 383, 388-89 (5th Cir. 2007)).

The Fifth Circuit has held a *prima facie* case only requires a "causal connection" between a protected activity and an adverse employment action. *Garcia v. Prof'l Contract Servs.*, 938 F.3d 236, 241, 243 (5th Cir. 2019); See *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997). However, the pretext stage "requires a showing of but-for causation, which requires more than mere temporal proximity." *Garcia*, 938 F.3d at 243-44; *Accord Feist v. Louisiana, Department of Justice, Office of the Attorney General*, 730 F.3d 450, 454 (5th Cir. 2013) "After the employer states its [legitimate] reason, the burden shifts back to the employee to demonstrate that the employer's reason is actually a pretext for retaliation, which the employee accomplishes by showing that the adverse action would not have occurred but for the employer's retaliatory motive. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362, 133 S. Ct. 2517, 2533 (2013)

> **2.     Lester cannot establish a causal connection between her reporting claims of defective devices and Wiley terminating her employment.**

Summary judgment on Lester's retaliation claim is appropriate because she cannot establish her prima facie case. More specifically, Lester cannot establish a causal connection between her reporting claims of the devices glitching and her employment ending.

Lester asserts the termination of her employment was in retaliation for her complaints of inappropriate use of funds to Dr. Bradley less than a month before her termination. However, Lester testified she has no knowledge of how Wiley managed or disbursed federal financial aid especially to students enrolled in the SCP program. (App. 94, 95, Lester Dep. at 68:20-25; 69:1-23). In fact, no auditor has found Wiley misappropriated or mismanaged financial aid funds or Pell

Grants *during Lester's employment*. (App. 40, 46, Felton Dep. at 27:11-20; 60:11-25).[11] Likewise, issues with tablets predated Lester's employment with Wiley. *Id*. Lester continued working for Wiley for another four years without facing any adverse employment actions. Rather, the undisputed summary judgment evidence shows that Wiley's decision to terminate Lester was based solely on the termination of the SCP program. (App. 140, Moody Dep. at 48:11-14; App. 39, Felton Dep. at 17:13-15).[12]  Accordingly, Lester cannot establish facts to plausibly show that her termination was based on her complaints and her claim must be dismissed.

### 3.    Wiley had a legitimate, non-retaliatory reason for terminating Lester's employment.

Even if Lester could establish a *prima facie* case of retaliation in violation of the FCA, which she cannot, her retaliation claim still fails as Wiley has articulated a legitimate, non-retaliatory reason for its actions. Although Lester may subjectively believe that she was terminated because of her complaints, her subjective belief is insufficient to cast doubt on Wiley's proffered reason for her termination. *Garcia v. Penske Logistics, L.L.C.*, 631 Fed. Appx. 204, 212 (5th Cir.2015).  Lester's discharge was solely based on the Louisiana Department of Public Safety & Corrections unilaterally ending its partnership with Wiley on February 6, 2023. (App. 140, Moody Dep. at 48:11-14; App. 39, Felton Dep. at 17:13-15). As mentioned, over 80 percent of Lester's workload was as a coordinator for the SCP program. (App. 101, Lester Dep. at 90:2-14). In fact, Lester acknowledged the other program she oversaw, for other adult education, only accounted for 16 percent of her workload. (App. 76, Lester Dep. at 13:12-24).[13]  In May 2023, Wiley even

---

[11]    Additionally, Lester admits the first time she alleged retaliation, or whistleblowing is in a letter she wrote after her termination on March 1, 2023. (App. 102, 103, Lester Dep. at 96:15-25; 97: 1-7; App. 119, Exhibit 11).

[12]    The mere temporal proximity between Lester's last alleged protected activity – which according to Lester was a repeat of complaint issues that predated her hire and complaints she made for years – and the termination of her employment, are simply not enough to state a claim against Wiley.

[13]    Indeed, Lester's suggestion Wiley should have continued to employ her after over 80 percent of job responsibilities ended defies logic.

terminated Dr. Johnson's employment once the winding down of the SCP program had been completed. (App. 141, Moody Dep at. 49:1-15; App. 43, Felton Dep at. 41:16-21). Lester offers no evidence that Wiley's reason for terminating her employment was pretext for retaliation and, therefore, her FCA retaliation must be dismissed.

## VI.    <u>CONCLUSION AND PRAYER</u>

For all the reasons set forth above, Defendant Wiley College. requests that the Court grant its motion for summary judgment in its favor on Lester's claims and for such further relief as the Court deems just and proper.

Respectfully submitted,

By:    */s/ Michael J. DePonte*
Michael J. DePonte
TEXAS BAR NO. 24001392
Avvennett Gezahan
TEXAS Bar No. 24099895
JACKSON LEWIS P.C.
500 N. Akard, Suite 2500
Dallas, Texas 75201
T (214) 520-2400
F (214) 520-2008
Michael.Deponte@jacksonlewis.com
Avvennett.Gezahan@jacksonlewis.com

**ATTORNEYS FOR DEFENDANT**

## **CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing Defendant Wiley College's Motion for Summary Judgment wase served via electronic mail on the 16th day of April, 2025, to the following:

Michael Patrick Doyle
Patrick M. Dennis
Jeffrey I. Avery
DOYLE DENNIS AVERY LLP
3401 Allen Parkway Ste 100
Houston, Texas 77019
service@doylelawfirm.com

*/s/ Michael J. DePonte*
Michael J. DePonte

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| **KAREN LESTER** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **vs.** | § | **Case No. 2:23-cv-00624-RWS-RSP** |
| | § | |
| **WILEY COLLEGE,** | § | |
| | § | |
| *Defendant.* | § | |

## <u>APPENDIX OF EXHIBITS IN SUPPORT OF DEFENDANTS'</u><br><u>MOTION FOR SUMMARY JUDGMENT</u>

The following exhibits are submitted in support of Defendant's Motion for Summary

Judgment:

| Exhibit | Description | Pages |
|---------|-------------|-------|
| 1 | Deposition of Dr. Tracy Andrus | 001 - 013 |
| 2 | Deposition of Andrea Buttross | 014 - 030 |
| 3 | Deposition of Dr. Herman J. Felton | 031 - 053 |
| 4 | Exhibit 4 to the Deposition of Dr. Herman J. Felton | 054 - 056 |
| 5 | Deposition of Muriel Leewright | 057 - 067 |
| 6 | Deposition of Plaintiff Karen Lester | 068 - 106 |
| 7 | Exhibit 2 to the Deposition of Plaintiff Karen Lester | 107 - 109 |
| 8 | Exhibit 5 to the Deposition of Plaintiff Karen Lester | 110 - 113 |
| 9 | Exhibit 9 to the Deposition of Plaintiff Karen Lester | 114 - 116 |
| 10 | Exhibit 11 to the Deposition of Plaintiff Karen Lester | 117 - 127 |
| 11 | Deposition of Krystal Moody | 128 - 142 |
| 12 | Excerpt of Certified TWC UI file -re: Plaintiff Karen Lester (Bates labeled Wiley College 000298 and 350) | 143 - 145 |

Respectfully submitted,

/s/ *Michael J. DePonte*
Michael J. DePonte
State Bar No. 24001392
michael.deponte@jacksonlewis.com
Avvennett Gezahan
State Bar No. 24099895
avvennett.gezahan@jacksonlewis.com
JACKSON LEWIS P.C.
500 N. Akard, Suite 2500
Dallas, Texas 75201
T (214) 520-2400
F (214) 520-2008

**ATTORNEYS FOR DEFENDANT**