# Exhibit 3

App. 31

DR. HERMAN J. FELTON  -  December 17, 2024

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

KAREN LESTER,                        *
        Plaintiff            *
                        *
                        *
                        *   Case No. 2:23-cv-00624
V.                                   *
                        *
WILEY COLLEGE,                       *
                        *
        Defendant.           *
                        *
                        *
                        *   (JURY DEMANDED)

-------------------------------------------------

ORAL/VIDEOTAPED/REMOTE DEPOSITION OF

DR. HERMAN J. FELTON

TUESDAY, DECEMBER 17, 2024

-------------------------------------------------

    Oral deposition of HERMAN FELTON, PhD, produced as

a witness at the instance of Plaintiff, and duly sworn

was taken in the above-styled and numbered cause on

December 17, 2024 from 9:01 a.m. to 10:34 a.m.  before

Nephtali Diaz, court reporter in the State of Texas, and

NOTARY in and for the State of Texas, reported by

machine shorthand method, pursuant to the Federal Rules

of Civil Procedure, and the provisions stated on the

record or attached hereto.

App. 32

DR. HERMAN J. FELTON  -  December 17, 2024

Page 2

1                  A P P E A R A N C E S

2

3   FOR PLAINTIFF, KAREN LESTER:

4        MR. MICHAEL DOYLE
         DOYLE DENNIS AVERY LLP
5        3401 ALLEN PARKWAY
         SUITE 100
6        HOUSTON, TEXAS 77019
         (713)571-1146
7        service@doylelawfirm.com

8

9   FOR DEFENDANT, WILEY COLLEGE:

10        MS. AVVENNETT GEZAHAN
          JACKSON LEWIS P.C.
11        500 N. AKARD STREET
          SUITE 2500
12        DALLAS, TX 75201
          (214)520-2400
13        avvennett.gezahan@jacksonlewis.com

14

15   Also Present:

16        MR. JOSEPH MOORE - Videographer

17        MS. KAREN LESTER

18

19

20

21

22

23

24

25

DR. HERMAN J. FELTON  -  December 17, 2024

Page 3

1                    EXAMINATION INDEX                PAGE

2

3    Appearances.................................    2

4    HERMAN FELTON, PhD

5    Examination by Mr. Doyle....................    4
     Examination by Ms. Gezahan.................   58
6    Reporter's Certificate......................   66
     Witness Changes............................   68
7

8                      E X H I B I T S

9    Exhibit 1, firing letter....................   15
     Exhibit 3, letter..........................    6
10   Exhibit 4, letter..........................   11

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

App. 34

DR. HERMAN J. FELTON  -  December 17, 2024

Page 4

1               P R O C E E D I N G S

2               THE VIDEOGRAPHER:  This begins the

3    videotaped deposition of Dr. Herman Felton.  We are on

4    the record.  The time is 9:01 a.m. Central Standard

5    Time.  Today's date is December the 17th, 2024.

6               Would counsel please introduce yourselves

7    and who you represent after which the court reporter is

8    going to swear in the witness.

9               MR. DOYLE:  Mike Doyle here for

10   Ms. Lester.

11              MS. GEZAHAN:  Avvennett Gezahan for the

12   Defendant.

13              THE REPORTER:  Dr. Felton, Jr., would you

14   please raise your right hand?

15              Do you swear or affirm to tell the truth,

16   the whole truth, and nothing but the truth, so help you

17   God?

18              THE WITNESS:  Yes.

19              (Witness sworn.)

20              THE REPORTER:  All right.  Mr. Doyle, I'll

21   turn it over to you.

22              HERMAN FELTON,

23   having been first duly sworn, testified as follows:

24

25

DR. HERMAN J. FELTON  -  December 17, 2024

Page 5

1                    E X A M I N A T I O N

2   BY MR. DOYLE

3        Q.   Tell us your name please, sir.

4        A.   Herman James Felton, Jr.

5        Q.   And, Dr. Felton, you're the president and CEO

6   of Wiley College?

7        A.   That is correct.

8        Q.   You've had that position for about how long?

9        A.   Coming up on seven years.

10       Q.   We're taking your deposition remotely today,

11  and if because of that or any technical or any other

12  reason you do not understand one of my questions or need

13  me to repeat it, will you please tell me, sir?

14       A.   Yes, sir.

15       Q.   And even though we're not in the courthouse,

16  it's the same oath, same responsibility to answer to the

17  best of your ability under oath as if you were in front

18  of them.  You understand that?

19       A.   That is correct.

20       Q.   You've had a chance to prepare for this

21  deposition by looking at any particular

22  documents/materials at all?

23       A.   Yes.  Some.

24       Q.   What?

25       A.   The documents that were put in front of me,

DR. HERMAN J. FELTON  -  December 17, 2024

Page 11

1  where we've had some challenges before, previous

2  institutions, nothing remotely close to a

3  misappropriation of funds or misuse of funds or any of

4  that.  We've not done that in my tenure, nor have my

5  predecessors ever done that.

6      Q.   You mentioned in getting ready for this

7  deposition you also reviewed a letter from the Louisiana

8  Department of Public Safety & Corrections.  Do you

9  recognize it as Plaintiff Exhibit 4?

10              (Exhibit 4 was marked.)

11      A.   I do.

12      Q.   (By Mr. Doyle) Had you seen this document

13  before yesterday?

14      A.   Yes.

15      Q.   Did this letter of notification from the

16  Louisiana Department of Public Safety & Corrections

17  indicate that Federal funds were not being properly

18  utilized by Wiley University?

19      A.   No, it does not.

20      Q.   Does it indicate that there were failure to

21  provide participants with documents in actual electronic

22  devices required by the program?

23      A.   It says:  "Failure to provide participants with

24  formal letters noticing of status changes or information

25  that is pertaining to completing degrees, delay in

DR. HERMAN J. FELTON  -  December 17, 2024

Page 12

1    deploying ATL law devices," but it does not say that it

2    was a failure to provide those.

3        Q.   When did you first become aware of any issues

4    with the management of the Second Chance Pell program

5    with the State of Louisiana by Wiley University?

6        A.   It was sometime out of COVID.  I don't remember

7    precisely the date, but it was sometime coming out of

8    COVID -- '21, probably '22, I think it was.

9        Q.   How did you become aware?

10       A.   I actually had a phone call with the warden and

11   a gentleman who was a member of the warden's team.

12       Q.   And what prompted that phone call?  How did it

13   come about?

14       A.   It was prompted because at that time Mr. Javan

15   Reed was a poor communicator and they wanted me to know

16   that he had missed a couple of dates.  It was

17   exacerbated by -- I think their haste was because there

18   was a meeting scheduled and Mr. Reed was uncomfortable

19   given that COVID was still a problem here in Texas and

20   Louisiana and he didn't want to go to the meeting.  So

21   that was, I think, the reason for their communication.

22       Q.   So you got a call from a warden and an

23   associate with the prison system because Mr. Reed had,

24   sounds like, cancelled a meeting because he did not want

25   to travel because of COVID concerns.  Am I saying that

DR. HERMAN J. FELTON  -  December 17, 2024

Page 17

1    A.    Vaguely.

2    Q.    What?

3    A.    I recall that they wanted to terminate her.
4    The recommendation was by her immediate supervisor, the
5    provost or her -- his supervisor approved it, HR
6    approved it, and that was -- that's the chain for every
7    division.

8                 So there's a couple of -- a couple of
9    steps unless I'm terminating a VP, so it's typically a
10   two-, three-step process.  Nothing out of the ordinary
11   occurred with her termination or separation from any
12   other individual.

13   Q.    What reason, if any, can you share with us was
14   given by your vice president for firing Ms. Lester?

15   A.    Well, we knew that the program was ending.
16   That program, Wiley, at the time, College, was a part of
17   a cohort that was initially started by the Department of
18   Justice to do the justice-involved education.  It had a
19   shelf life.

20                When I got here in '18, I saw that the
21   college was really running at a deficit to operate the
22   program, so I knew that we would not be -- in '18 --
23   would not be signing up to get the program again.  So
24   that meant everyone in the program that was supported by
25   the program would eventually have no place of

DR. HERMAN J. FELTON  -  December 17, 2024

Page 27

1      A.   Yeah, for students.  Federal financial aid.

2   It's not a grant.  It's a Federal financial aid.

3   They're loans.  So yes, we received those and they're --

4   the Pell Grants are for individuals to help subsidize

5   their education.

6      Q.   And when you say they're loans, were the

7   incarcerated persons required to repay them, or do you

8   know?

9      A.   No, they're not.  Not the Pell Grants, no.  Not

10   the -- that's financial aid.

11      Q.   And the Pell Grants had certain requirements

12   imposed upon Wiley to timely and properly manage the

13   program?

14      A.   Absolutely.  Which we do -- which is notated in

15   our audit every year.

16      Q.   And when you say "notated in our audit," what

17   do you mean?

18      A.   It's notated in our audit that we disburse and

19   have no findings for any improprieties regarding Federal

20   financial aid or Pell Grants.

21      Q.   And when you talk about improprieties, you're

22   talking about the money not being spent on a proper

23   purpose?

24      A.   I think it's very vague, impropriety, to

25   include that, yes.

DR. HERMAN J. FELTON  -  December 17, 2024

Page 28

1      Q.   Now this audit you're talking about, is it
2  simply a financial audit, or is there actually an audit
3  of the performance of the contract?
4      A.   It's an audit that is accepted for every
5  university in these contiguous states that is done by an
6  independent auditor that is also done by the Department
7  of Education.
8      Q.   This audit, is it actually -- create a document
9  of some kind?
10     A.   All audits do.
11     Q.   So this audit you're referring to of the
12  management of the Second Chance Pell Experiment, you
13  received a document of some kind --
14     A.   No.  We don't have a -- I apologize.  We don't
15  have an audit of the Second Chance Pell program.  We
16  have an audit of all of our Federal financial aid and
17  funding, no audit of the Second Chance Pell program.
18     Q.   There's no separate audit of the Second Chance
19  Pell Experiment program?
20     A.   There's no reason.  There's no separation of
21  our graduate programs.  It's the Federal -- a student,
22  every student that receives Federal financial aid via
23  loans, subsidized or unsubsidized, parent PLUS loans, or
24  Pell Grants.  They're all included in our audit.
25     Q.   What you're saying is on an annual basis,

DR. HERMAN J. FELTON  -  December 17, 2024

Page 30

1    years.

2        Q.    And during the years that Wiley was managing

3    the Second Chance Pell program, not a single concern was

4    raised about the operation of that program by Wiley?

5        A.    I learned that there was a student or two who

6    was still -- that dropped out of the program, but we

7    sent that money back.  In fact, Dr. Bradley, when that

8    was raised, made sure of that, but other than that,

9    there are no other issues with that.

10       Q.    Oh, this sending back money --

11       A.    Uh-huh.

12       Q.    -- when did that occur?

13       A.    As soon as we found out that there was an

14   issue.

15       Q.    Was this something before the notification,

16   February 6th, 2023, from the state of Louisiana, they

17   were ending the partnership?

18       A.    I'm not sure.  I don't know exactly when those

19   dates were.

20       Q.    Other than the one call with the warden, Zoom

21   call, absolutely, positively no indication from

22   Dr. Bradley or any other person of improper management

23   of the Second Chance Pell Experiment until you got this

24   letter February 23 from the Department?

25       A.    Yeah.  Very clear that there has never been

DR. HERMAN J. FELTON  -  December 17, 2024

Page 41

1    partners to see if the person has any intrinsic value

2    that may be good for the institution, and if it's not

3    determined that there's another place for them or if

4    there's something else that can be done for them that

5    has already been done, then we proceed with separating.

6         Q.   Dr. Gibson, he was fired as well?

7         A.   Dr. Gibson was separated as well.

8         Q.   Is that something different from firing?

9         A.   People separate.  I don't use the word

10   "firing."  I think it's antiquated.  I'd rather separate

11   someone.

12        Q.   Separate means their employment ends?

13        A.   That's correct.

14        Q.   Not at the employee's choice?

15        A.   Sometimes.

16        Q.   Dr. Johnson's employment ended not at his

17   choice?

18        A.   That would be correct.

19        Q.   Because...

20        A.   The program was ending and a recommendation for

21   a termination was put forward.

22        Q.   Dr. Gibson, he was also -- you don't like the

23   word "fired" -- separated; is that correct, sir?

24        A.   That is correct.

25        Q.   And the reason for Dr. Gibson's -- what you

DR. HERMAN J. FELTON  -  December 17, 2024

Page 54

1    Department of Corrections?

2         A.   I don't recall.

3         Q.   Did you make any effort to ask, "Are these

4    legitimate in any way" from the vice president --

5         A.   No.  I don't recall.

6         Q.   Did it matter to you whether for the years that

7    the program had been administrated by Wiley there were

8    legitimate issues about performance or not?

9         A.   So I'm a product of poverty.  I grew up around

10   crime.  My father was justice involved.  I did not

11   graduate from high school; I'm dyslexic.  I -- yeah, I

12   rose to get two terminal degrees, a law degree and a

13   PhD.

14            My family's trajectory was changed because

15   of an education at a historically black college.  I have

16   happened to find myself as president of a historically

17   black college.  I care about everything that we do on

18   this campus to include anything that Wiley was involved

19   in.

20            And to be a part of a program that deals

21   with justice-involved African Americans, browns, or any

22   American, I'm particularly proud of given the hist- --

23   historical complex of Wiley University and how it was

24   founded out of racism, anger, prejudice, and to rise

25   above that and to give those who ordinarily don't have

DR. HERMAN J. FELTON  -  December 17, 2024

Page 59

1    to?

2        A.   They would have went to the director of the

3    Second Chance Pell program up to the dean that

4    reports -- the director reports to -- then up to the VP

5    and then ultimately they would have come to me.  The

6    coordinator would have had knowledge of it, who is

7    Mrs. Lester.  The director would have had knowledge of

8    it.  All would have knowledge of those concerns.

9        Q.   Okay.  We spent some time talking about

10   mismanagement of Second Chance Pell Grant funds.

11            Did you ever get a complaint from Ms. Lester

12   directly regarding the Second Chance Pell Grant?

13       A.   Never got a complaint from anyone including the

14   warden and the director of the program who was on-site.

15   I've never heard that until this lawsuit.

16       Q.   Okay.  And again, with Dr. Bradley's

17   conversations with Ms. Lester, there was no -- from your

18   recollection, were there any conversation regarding the

19   Second Chance Pell program, specifically mismanagement

20   of Pell Grant funds?

21       A.   Nope.

22       Q.   Okay.  If you would have heard about

23   mismanagement of those Pell Grant funds, what would you

24   have done?

25       A.   Investigated it.  And had there been any

DR. HERMAN J. FELTON  -  December 17, 2024

Page 60

1  misappropriation, the Department of ED would certainly

2  allow you to correct it, but someone would've been

3  terminated if I found that there was malice, if we acted

4  in a way that wasn't sufficient.

5              But the first thing would've been an

6  investigation to determine if there was indeed factual

7  evidence to dictate that there was misappropriation.

8     Q.   Okay.  Let's talk about the audits of the Pell

9  Grant funds.  How are those audits conducted from your

10  knowledge?

11     A.   The audit is done every year by the Department

12  of Business and Finance.  We have an auditor, outside

13  independent auditor hired by the board of trustees.

14  They come and conduct an audit.  That audit is sent up

15  to the Department of Education which has to accept the

16  audit.  The audit is also sent to our Southern

17  Associations for Colleges and Schools, our accrediting

18  body, which also has to accept the audit.

19              That audit has to be accepted by our

20  business -- our finance committee on our board, and

21  that, to me, is the second line of defense.  Our first

22  line of defense is the auditor itself, the second is our

23  committee chair, the third is the Department of

24  Education.

25              Those happen every year.  Those -- every

DR. HERMAN J. FELTON  -  December 17, 2024

Page 61

1   student that receives Pell is subject -- Pell or

2   financial aid -- is subject to be audited, and every

3   year we are audited in our cash management among other

4   things.  But to include our Federal financial aid, we

5   have obtained clean audits in my tenure here.

6        Q.   Okay.  And regarding the Pell Grant, in

7   particular, during the audit, what are the auditors

8   looking at, from your knowledge?

9        A.   Well, they do what is called reconciliation.

10  They look to see if there's a transcript to draw down,

11  if a student is registered.  That's it.

12       Q.   Okay.

13       A.   I think there may be some other things there,

14  but that's typically the gist of it.

15       Q.   And if they found that a student wasn't

16  involved but received Pell Grants, what would happen in

17  a scenario like that?

18       A.   You'd have to send the money back.

19       Q.   Okay.  Since your tenure with Wiley College,

20  how many times has an auditor found financial aid was

21  disbursed to a student who wasn't enrolled?

22       A.   That was -- when I first got here, there was an

23  audit that was done in March.  I came early.  My tenure

24  started in June.  There was an audit that was done.

25  They found some reconciliation that needed to be done.

DR. HERMAN J. FELTON  -  December 17, 2024

Page 62

1    March of '18 that was done.  And then after that we've

2    not had any of those issues except for the

3    reconciliation here with one or two students for the

4    program.

5        Q.   And if, for some reason, Wiley was not in

6    compliance and the auditor found that there was some

7    error, what would happen for financial aid for the

8    school?

9        A.   Well, you wouldn't be able to award if there's

10   misappropriation, malice, if there's theft, but when --

11   when there is an error, which is how the Department of

12   ED describes it, you are given an opportunity to correct

13   that.

14       Q.   Okay.  And how important is financial aid for

15   the students at Wiley College?

16       A.   Lifeline.  89 percent of our students are first

17   gen, first generation Pell eligible, which means that

18   their parents' combined income is below 35,000 -- I

19   believe it was -- that's 90 percent of our student

20   population.  And if students aren't able to receive

21   Federal financial aid -- they're not able to pay for the

22   services that we offer -- college wouldn't exist.

23       Q.   Okay.  Has the U.S. Department of Education

24   ever done an investigation into Wiley for

25   misappropriation of Federal funds?

DR. HERMAN J. FELTON  -  December 17, 2024

Page 63

1      A.    No.

2      Q.    Has -- okay.  Has the U.S. Department of

3   Education ever done an inquiry into the mismanagement of

4   financial aid funds?

5      A.    Not to my knowledge.

6      Q.    Okay.  And last little topic, we talked about

7   termination.  From your knowledge, who initiated the

8   termination of Ms. Lester?

9      A.    I believe it was -- well, not believe; I know

10  now since this came up.  It was Mr. -- Dr. Johnson.

11     Q.    Okay.  And how many individuals have to approve

12  that termination or recommendation for termination?

13     A.    Dr. Johnson moves up to Ms. -- Dr. Cox, Dr. Cox

14  moves up to the assistant vice president; the assistant

15  vice president goes over to the vice president; the vice

16  president goes over to Mrs. Moody.

17            Mrs. Moody's job is to determine if there

18  are any issues, being our HR person.  They come to me,

19  and I ask that question again.  Sometimes Dr. Bradley is

20  in that layer.  But for this particular employee, there

21  would be three or four steps before it got to me, three

22  or four individuals that would have approved it, signed

23  off on it as well.

24     Q.    Okay.  And one of the steps you say you take is

25  to ask if there is another opportunity on campus for the

DR. HERMAN J. FELTON  -  December 17, 2024

Page 66

1                  UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF TEXAS
2                        MARSHALL DIVISION

3    KAREN LESTER,                 *
               Plaintiff          *
4                                  *
                                   *
5                                  *   Case No. 2:23-cv-00624
     V.                            *
6                                  *
     WILEY COLLEGE,                *
7                                  *
               Defendant.         *
8                                  *
                                   *
9                                  * (JURY DEMANDED)

10   ------------------------------------------------

11                  REPORTER'S CERTIFICATE

12          ORAL/VIDEOTAPED/REMOTE DEPOSITION OF

13                   DR. HERMAN J. FELTON

14               TUESDAY, DECEMBER 17, 2024

15   ------------------------------------------------

16        I, Nephtali Diaz, a COURT REPORTER in the State of

17   Texas and NOTARY in and for the State of Texas, hereby

18   certify to the following:

19        That the witness, HERMAN FELTON, PhD, was duly

20   sworn and that the transcript of the deposition is a

21   true record of the testimony given by the witness;

22        That the deposition transcript was duly submitted

23   on  January 3, 2025 to the witness or to the attorney

24   for the witness for examination, signature, and return

25   to me by February 3, 2025.

DR. HERMAN J. FELTON  -  December 17, 2024

Page 67

1        That pursuant to information given to the

2   deposition officer at the time said testimony was taken,

3   the following includes all parties of record and the

4   amount of time used by each party at the time of the

5   deposition:

6           Mr. Doyle (1 hr, 15 mins)
                 Attorney for Plaintiff
7        Ms. Gezahan (10 mins)
                 Attorney for Defendant
8

9        I further certify that I am neither counsel for,

10   related to, nor employed by any of the parties in the

11   action in which this proceeding was taken, and further

12   that I am not financially or otherwise interested in the

13   outcome of this action.  Certified to by me on this 3rd

14   day of January 2025.

15

16

17

18

19

20

21

22

23

24

25

DR. HERMAN J. FELTON  -  December 17, 2024

Page 69

1      I, Herman Felton, PhD, have read the foregoing
transcript and hereby affix my signature that same is
2 true and correct, except as noted on the previous
page(s), and that I am signing this before a Notary
3 Public.

4

5                        _____
                         Herman Felton, PhD
6

7 _____ No changes made _____ Amendment Sheet(s) attached

8

9
THE STATE OF _____)
10 COUNTY OF _____)

11

12      Before me, _____, on this
_____ personally appeared, Herman Felton, PhD,
13 known to me (or proved to me under oath or through
_____) (description of identity card or
14 other document) to be the person whose name is
subscribed to the foregoing instrument and acknowledged
15 to me that they executed the same for the purposes and
consideration therein expressed.
16      Given under my hand and seal of office this ___ day
of _____, 2024.

17

18

19                        _____
                         NOTARY PUBLIC IN AND FOR
20                        THE STATE/COUNTRY OF _____
                         COMMISSION EXPIRES: _____
21

22

23

24

25

DR. HERMAN J. FELTON  -  December 17, 2024

Page 70

1

2

                            /S/ Nephtali Diaz
3        _____

4        NEPHTALI DIAZ

5        MILLER-REPORTING
         Firm Registration #62
6        1225 North Loop West
         Houston, TX 77008
7        (713)626-2629

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

App. 53