# Exhibit 6

App. 68

```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF TEXAS
 2                        MARSHALL DIVISION

 3   KAREN LESTER,                )
          Plaintiff,              )
 4                                )
                                  )
 5   VS.                          )CASE NO:23-cv-00624-RSW-RSP
                                  )
 6   WILEY COLLEGE,               )
          Defendant               )
 7

 8

 9

                    ------------------------------------
10                     VIDEOTAPED DEPOSITION OF

11                          KAREN LESTER

12                       FEBRUARY 4, 2025
                    ------------------------------------
13

14

15

16            VIDEOTAPED DEPOSITION OF KAREN LESTER,

17   produced as a witness at the instance of the Defendant,

18   and duly sworn, was taken in the above-styled and

19   -numbered cause on February 4, 2025, from 9:34 a.m. to

20   12:37 p.m., before Melanie Seifert, CSR in and for the

21   State of Texas, reported by machine shorthand, at the

22   law offices of Roberts & Roberts Law Firm, 1125 Judson

23   Road, Suite 105, Longview, Texas, pursuant to the

24   Federal Rules of Civil Procedure and the provisions

25   stated on the record or attached hereto.
```



1              A P P E A R A N C E S

2

   FOR THE PLAINTIFF:
3
   Michael Patrick Doyle
4  DOYLE DENNIS AVERY, LLP
   3401 Allen Parkway, Suite 100
5  Houston, Texas 77019
   Phone:  (713) 571-1146
6  E-mail: service@doylelawfirm.com

7

   FOR THE DEFENDANT:
8
   Michael J. DePonte
9  JACKSON LEWIS, PC
   500 N. Akard, Suite 2500
10 Dallas, Texas 75201
   Phone:  (214) 520-2400
11 E-mail: michael.deponte@jacksonlewis.com

12

   ALSO PRESENT:
13
   Nicholas Makarenko, Videographer
14 Krystal Moody, Wiley College
   Dr. Tashia Bradley, Wiley College
15

16

17

18

19

20

21

22

23

24

25



App. 70

```
 1                          INDEX

 2                                                PAGE

 3   Appearances...................................2

 4   Exhibit Index.................................4

 5   KAREN LESTER

 6   Examination by Mr. DePonte....................5

 7   Reporter's Certificate......................114

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1                              EXHIBITS

 2     EXHIBIT NAME    DESCRIPTION                        PAGE

 3     Exhibit 1       Wiley College Office of Human
                       Resources Checklist
 4                     Wiley College 000157-184..........33

 5     Exhibit 2       Job Description
                       Wiley College 000151-152..........45
 6
       Exhibit 3       E-mails 3/3/22
 7                     Wile College 000217-218...........72

 8     Exhibit 4       E-mails 3/15/22
                       Wiley College 000231-234..........74
 9
       Exhibit 5       E-mails 4/5/22
10                     Wiley College 000237-239..........77

11     Exhibit 6       Letter To Ms. Moody
                       Lester 00316-321..................79
12
       Exhibit 7       E-mail 5/16/22
13                     Wiley College 000145-146..........80

14     Exhibit 8       E-mail 5/23/22
                       Wiley College 000253-254..........83
15
       Exhibit 9       Department of Public Safety &
16                     Corrections State of Louisiana
                       Wiley College 000147-148..........85
17
       Exhibit 10      Wiley College Termination
18                     Letter 3/1/23
                       Wiley College 000156..............89
19
       Exhibit 11      Letter Karen Lester
20                     Lester 00306-315..................92

21     Exhibit 12      Plaintiff's Objections And Answers
                       To Defendant's First Set Of
22                     Interrogatories..................105

23

24

25
```



```
 1                P R O C E E D I N G S
 2                THE VIDEOGRAPHER:  We're now on the record.
 3  This begins the videotape number one of the deposition
 4  of Karen Lester, in the matter of Karen Lester versus
 5  Wiley College, in the District Court of the Eastern
 6  District of Texas, Marshall Division, Case Number
 7  2:23-CV-00624-WRS-RSP [sic].
 8                Today is February 4th, 2025, and the time
 9  is 9:34 a.m.  This deposition is being taken at Roberts
10  & Roberts Law Firm, in Longview, Texas, at the request
11  of Jackson Lewis Law Firm.  The videographer is Nicholas
12  Makarenko of Magna Legal Services, and the court
13  reporter is Melanie Seifert with Magna Legal Services.
14                Will counsels and all parties present state
15  their appearance and whom they represent.
16                MR. DOYLE:  Patrick Doyle, for Ms. Lester.
17                MR. DEPONTE:  And Michael DePonte, for
18  Wiley College.
19                (Witness sworn.)
20                MR. DEPONTE:  All right.  Counsel, we're
21  just doing this pursuant to federal rules?
22                MR. DOYLE:  Yes.
23                MR. DEPONTE:  Okay.
24                     KAREN LESTER,
25  having been first duly sworn, testified as follows:
```



```
 1                      EXAMINATION
 2   BY MR. DEPONTE:
 3        Q.  All right.  Good morning, Ms. Lester.
 4        A.  Good morning.
 5        Q.  As I introduced myself to you earlier, my name
 6   is Mike DePonte.  I'm with Jackson Lewis.  And you
 7   understand I represent Wiley College?
 8        A.  Uh-huh.  Yes.
 9        Q.  Okay.  Have you ever had your deposition taken
10   before?
11        A.  No.
12        Q.  Okay.  So let's just talk about some of the
13   ground rules.  Real straight forward.
14        A.  Uh-huh.
15        Q.  This is not a marathon.  Okay?  If you need to
16   take a break, you just let me know.  All I ask is that,
17   if I've asked you a question, you answer the question
18   and then we take a break.  Okay?
19        A.  Okay.
20        Q.  Another rule is, you got to answer orally.
21        A.  Okay.
22        Q.  So you can't shake your head yes or shake your
23   head no because that makes it real hard for the court
24   reporter to write down.
25        A.  Okay.
```



App. 74

```
 1        A.   How Dr. Johnson will talk to me.  How
 2   Dr. Johnson would hover over me.
 3        Q.   And it's your testimony that she personally
 4   witnessed these incidents?
 5        A.   Yes.
 6        Q.   And in what building did Ms. Thomas work?
 7        A.   Thirkield.
 8        Q.   Okay.  And we'll come back to Ms. Thomas.  What
 9   knowledge do you think she has of the Second Chance Pell
10   Grant Program?
11        A.   She was an instructor for English.
12        Q.   So was she teaching live classes at the
13   college?
14        A.   No.
15        Q.   Okay.
16        A.   Online.
17        Q.   And for the jury, explain how that worked.  If
18   she taught classes online, to whom is she broadcasting?
19        A.   Who is she broadcasting to?  The prison inmates
20   that was at three -- three facilities:  Raymond Laborde,
21   David Wade, Lake Providence was -- okay.  It was a
22   detention center.
23        Q.   All right.  You had David Wade, Lake
24   Providence.
25        A.   Uh-huh.
```



```
 1          Q.  And what was the last -- other one?  I'm sorry.
 2          A.  Raymond Laborde.
 3          Q.  And where were these locations -- where were
 4     these prisons located?
 5          A.  In Louisiana.  All of them was in Louisiana.
 6          Q.  Okay.  And what was your official title with
 7     the college?
 8          A.  Coordinator for Extended Education.
 9          Q.  With the Second Chance Pell Grant being the
10     extended education?
11          A.  Yes.  Part of it.
12          Q.  Okay.  What else did you have?
13          A.  The Adult Program.
14          Q.  The Adult Program?
15          A.  Uh-huh.
16          Q.  And how many folks did you have in the Adult
17     Program?
18          A.  It'd fluctuate.  Maybe 16, 17.
19          Q.  And then of the three prisons, how many inmates
20     or detainees were involved in the program?
21          A.  It'd fluctuate.  84.
22          Q.  So you had about a hundred total in the -- for
23     which you were responsible for coordinating?
24          A.  Somewhat.
25          Q.  Somewhat.  What --
```



```
 1          A.   Yes.

 2          Q.   Okay.  I just wanted to ask -- what do you mean

 3     by "somewhat"?

 4          A.   Because it'd fluctuate.  In the prisons,

 5     sometimes they don't stay the whole semester.  They

 6     would sometime drop out or go to lockup.  When they went

 7     to lockup, they had to be removed from the program.

 8          Q.   So would I be accurate in saying, on average,

 9     you had about a hundred or so in the program?

10          A.   Between the two?

11          Q.   Yes.

12          A.   Yes.

13          Q.   Okay.  Okay.  So just so we're all clear on the

14     record, what is your full name?

15          A.   My full name is Karen Michelle Lester.

16          Q.   And have you gone by any other names?

17          A.   Tippy, my nickname.

18          Q.   T-I-P-P-Y?

19          A.   Yes.

20          Q.   And are you married?

21          A.   No.

22          Q.   And what's your date of birth?

23          A.   June 13, 1968.

24          Q.   And what is your current address?

25          A.   1902 Turtle Creek Drive, Marshall, Texas 75670.
```



```
 1        A.  Late 2022 was one of the worst periods in my
 2   life at Wiley College, when Dr. Timothy Johnson became
 3   my supervisor.  He was an executive director.
 4   Dr. Johnson is like -- you never -- I never knew that to
 5   expect.
 6        Q.  Okay.  And we'll talk about Dr. Johnson here in
 7   a moment, but when did Dr. Johnson become your
 8   supervisor?
 9        A.  2022.
10        Q.  Do you remember what month?
11        A.  No.
12        Q.  So is it your testimony today -- and correct me
13   if I'm wrong -- that Dr. Johnson caused -- caused your
14   anxiety, or working with him caused your anxiety?
15        A.  Didn't cause it but contribute.
16        Q.  Okay.  What were the other causes of your
17   anxiety?
18        A.  Life.
19        Q.  Outside of Wiley College?  Like life outside of
20   the college?
21        A.  Anxiety is anxiety.  We all have anxiety.
22        Q.  Well --
23        A.  Different things bring it up, but yeah.
24        Q.  So as you testify today, it wasn't just the
25   college that caused you anxiety; you had other issues
```



```
 1        A.   2006.
 2        Q.   And where was that?
 3        A.   Marshall.
 4        Q.   What college?
 5        A.   Wiley.
 6        Q.   And did you get a degree from Wiley?
 7        A.   Yes.
 8        Q.   What degree did you get?
 9        A.   Bachelor's of Art in Criminal Justice.
10        Q.   In what year?
11        A.   2010.
12        Q.   Any other degrees which you currently hold?
13        A.   No.
14        Q.   Aside from BMI and Wiley College, any other
15   college courses you've taken?
16        A.   I had a CNA at Panola.
17        Q.   Have you used your CNA certification before?
18        A.   Yes.
19        Q.   At some prior employment?
20        A.   Yes.
21        Q.   And we'll talk about your employment history in
22   a moment.
23             Any other certifications or licenses that
24   you hold?
25        A.   No.
```



```
 1          A.  I just talked to Dr. Andrus.  I knew that they
 2     was getting a Second Chance Pell.
 3                〔Exhibit 2 marked.〕
 4          Q.  〔BY MR. DEPONTE〕  I'm going to hand to you what
 5     I've marked as Deposition Exhibit 2.  Do you recognize
 6     this document?
 7          A.  Somewhat.
 8          Q.  And when you say "somewhat," what do you mean?
 9          A.  I recognize it, yes.
10          Q.  And at the top, it says job description,
11     correct?
12          A.  Yes.
13          Q.  And then your title was program coordinator,
14     Second Chance Pell, correct?
15          A.  Yes.
16          Q.  And that's the position you held while at Wiley
17     College?
18          A.  Yes.
19          Q.  Any other positions you held at Wiley College?
20          A.  Yes.
21          Q.  Okay.  What else did you --
22          A.  It was --
23          Q.  I'm sorry.  What other positions did you hold
24     at Wiley College?
25          A.  I was the program coordinator for Second Chance
```



```
 1  Pell and Extended Education.
 2      Q.  So did -- when you were hired -- strike that.
 3              When you were hired, were you hired for the
 4  Second Chance Pell --
 5      A.  Yes.
 6      Q.  -- Program?
 7              Okay.  And then you indicated that your job
 8  changed to add Extended Education?
 9      A.  Yes.
10      Q.  Okay.  When did that change?
11      A.  I want to say sometime in 2019, they removed me
12  from under Dr. Andrus.
13              THE REPORTER:  I'm sorry?
14              THE WITNESS:  I was removed from under
15  Dr. Andrus.
16      Q.  (BY MR. DEPONTE)  Okay.  And I'm sorry.  I'm
17  not following.  I under -- even if you were removed from
18  under Dr. Andrus in 2019, how is it that you came to be
19  responsible for the Extended Education?
20      A.  When I was removed from Dr. Andrus in 2019, I
21  was up under Javan Reed, Mr. Reed, and Mr. Reed took
22  over the Adult Program.
23      Q.  Were you involved with the Adult Program before
24  Mr. Reed took over?
25      A.  No.
```



```
 1        Q.  Is it Mr. Reed or Dr. Reed?

 2        A.  Mr. -- it's --

 3        Q.  Okay.

 4        A.  -- probably -- it's Dr. Reed now, but at the

 5   time --

 6        Q.  Okay.

 7        A.  -- it was Mr. Reed.

 8        Q.  Fair enough.

 9            So as of 2019, you were responsible for the

10   Second Chance Pell Grant Program and Extended Education,

11   correct?

12        A.  Yes.

13        Q.  And the Extended Education was the extended --

14   the adult education that we talked about earlier,

15   correct?

16        A.  Yes.

17        Q.  Where you said there were about 16, 18 folks,

18   in general?

19        A.  Yes.

20        Q.  Any other positions which you held at Wiley

21   College?

22        A.  No.

23        Q.  And did you have any issue taking on the

24   additional educational responsibilities?

25        A.  No.
```



1    Q.  So in your role as program coordinator of

2 Second Chance Pell, what is it in your mind that you

3 were responsible for?

4    A.  In my mind?

5    Q.  Yes.

6    A.  In my mind, Second Chance Pell, to follow the

7 guidelines when I was under Dr. Andrus.  He explained to

8 me what they do.  I was -- I was to keep up with the

9 concerns from the inmates, the prison, make sure that

10 their work is uploaded on their devices and make sure

11 that all documents that was needed for the college was

12 given and received from the prison.

13    Q.  And were those pretty much the duties that you

14 performed while you were in this position?

15    A.  We made visits, campus visits, to the facility.

16    Q.  How often?

17    A.  Up under Dr. Andrus and Mr. Reed, maybe two a

18 semester.

19    Q.  And the Extended Education Program that you

20 were responsible for, that was also funded by the Second

21 Chance Pell Grants?

22    A.  I'm not sure.

23    Q.  Okay.  But you're the -- you were the program

24 coordinator for Second Chance Pell, correct?

25    A.  Yes.



1      Q.  And if you are the coordinator for Second

2  Chance Pell Grant, would you agree with me that without

3  the Second Chance Pell Grant there's nothing for you to

4  do; or that's -- that was the vast majority of your job,

5  wasn't it?

6      A.  No.

7      Q.  Okay.  What was the other part of your job?

8      A.  Extended Education.

9      Q.  With the 16 or 18 adults?

10      A.  Yes.

11      Q.  So would you agree with me that the Second

12  Chance Pell was the vast majority of what you were

13  doing?

14      A.  Yes.

15      Q.  And we'll get into what you are complaining

16  about regarding Wiley College, but can we agree that the

17  only thing you were -- you are complaining about, about

18  Wiley College, with respect to any misappropriation of

19  federal funds was -- was the Second Chance Pell?

20      A.  Yes.

21      Q.  And without going through the entire handbook,

22  do you recall receiving a handbook from Wiley College?

23      A.  A handbook?

24      Q.  Yes.

25      A.  No.



```
 1    the Second Chance Pell Grant?
 2         A.   Ask -- ask -- I mean, ask that again.
 3         Q.   Sure.  So -- and you can tell me if I'm wrong,
 4    but the crux of your complaint is that you are
 5    complaining about the Second Chance Pell Grants,
 6    correct?
 7         A.   Yes.
 8         Q.   That Wiley College was handling?
 9         A.   Yes.
10         Q.   When did you first complain about the Second
11    Change Pell Grant?
12         A.   When I worked under Mr. Reed.
13         Q.   Okay.  And so when was that?
14         A.   2019-20.
15         Q.   2020?
16         A.   19-20.  That's when I worked up under Mr. Reed.
17         Q.   Oh, got it.
18              And to whom did you complain?
19         A.   Mr. Reed, Dr. Todd, Dr. Miles, Dr. Johnson.
20         Q.   Okay.  So I'm sorry, you said Dr. Reed, Dr. Ty
21    [sic], Dr...
22         A.   Miles.
23         Q.   ...Miles.  And who else?
24         A.   Dr. Johnson.
25         Q.   Okay.  So on what date did you talk to
```



```
 1   Dr. Reed --
 2          A.  I can't remember.
 3          Q.  -- Mr. Reed?
 4               On what date did you talk to Dr. Ty or
 5   Mr. Ty?
 6          A.  I don't remember, Dr. Todd was the provost at
 7   the time.
 8          Q.  On what date did you talk to Dr. Miles?
 9          A.  I don't remember.
10          Q.  How about Dr. Johnson?
11          A.  I don't remember.
12          Q.  Was it all on one date that you spoke to the
13   four of them?
14          A.  Prob- -- no.
15          Q.  Okay.  What did you tell Dr. Reed?
16          A.  What did I tell Mr. Reed?  Mr. Reed?
17          Q.  Sorry, he's doctor now.  I have in my head
18   Dr. Reed.
19          A.  Well, at the time, the prison was experiencing
20   issues with the devices and students were enrolled in
21   classes but the classes was not populating on the
22   device.  So I would get messages from the prison and
23   from the students and from family members about Wiley
24   using the students just to get money.
25          Q.  Okay.  So let's talk about that process with
```



```
 1   the devices.  Who purchased the devices?
 2        A.  I'm not sure.  The devices was there before I
 3   got there.
 4        Q.  So the -- and I'm just gonna call it prison.
 5   It could be a detention center, but we'll just call it
 6   the prison.
 7                 The prison has these devices and your
 8   complaint was that programming was not uploaded to the
 9   devices?
10        A.  Not my compliant; the students' complaints.
11        Q.  Well, and I'm talking about what you reported
12   to Dr. Reed.
13        A.  Oh, yes.
14        Q.  So you're telling Dr. Reed that the programming
15   is not uploading to the devices?
16        A.  Yes.
17        Q.  Okay.  Why was that?
18        A.  I'm not sure.
19        Q.  Okay.  Whose responsibility was it to ensure
20   that the programming was uploaded to the devices?
21        A.  Mr. Reed's.
22        Q.  And what was his title at that time?
23        A.  He was the -- I can't remember.
24        Q.  What was your responsibility to ensure that the
25   information was being uploaded to the devices?
```



```
 1        Q.   So just so I understand the process.  An inmate
 2   provides an application to the prison, correct?
 3        A.   Uh-huh.  Yes.
 4        Q.   Goes through the warden or somebody at the
 5   prison?
 6        A.   Yes.
 7        Q.   And then it's your testimony that the prison
 8   transmits it to the college?
 9        A.   Yes.
10        Q.   To whom did it go at the college?
11        A.   To me.
12        Q.   And then what did you do once you received an
13   application?
14        A.   Once I received the application, I vetted them
15   out, make sure the application was correct, had all the
16   information that was needed, ordered the transcripts.
17   Once the transcript come back, I would put it in the
18   system, send it to the registrar's office, send it to
19   the financial aid office.  From that point, the
20   registrar office would clear them and they would come up
21   on the spreadsheet or however to register them.
22        Q.   So it's your testimony that you would look into
23   the LMS sometimes and a student would not be there?
24        A.   The work wouldn't be there.
25        Q.   The work wouldn't be there?
```



```
 1        A.  Yes.
 2        Q.  But you're not complaining that any student who
 3   registered or who tried to register were not registered
 4   for the course, correct?
 5        A.  Ask me that again.
 6        Q.  Sure.  I'm just trying to understand if every
 7   student who put in an application was registered in the
 8   LMS?
 9        A.  If every student -- yes.
10        Q.  Okay.
11        A.  They were registered.
12        Q.  Any other issues -- well, I'm sorry.
13   We haven't -- we're not done speaking about Dr. Ty
14   [sic].
15             What did you complain to Dr. Ty about?
16        A.  About the devices, the courses was not
17   populating on the devices, the prison had a lot of
18   concerns about how the program was being ran, the
19   inmates --
20        Q.  Okay.  I -- and I need specifics.  When you say
21   "the devices," the devices aren't with Wiley College,
22   correct?
23        A.  Yes.
24        Q.  They're actually at the prison, correct?
25        A.  They at the prison, yes.
```



1   We could log into their account and see that they were

2   enrolled in the classes but no classes was populated.

3        Q.   Okay.  But again, you don't know if that's a

4   device issue or -- a hardware issue or a software issue,

5   do you?

6        A.   I don't know.

7        Q.   And who is responsible for ensuring that the

8   devices were working when you were working -- when you

9   worked for Wiley College?  Were you responsible for it?

10       A.   Mr. Reed.

11       Q.   Well, Mr. Reed wasn't there the whole time.

12       A.   When Mr. Reed wasn't there?  Dr. Andrus,

13  Mr. Reed and Dr. Cox, Dr. Johnson.

14       Q.   Let's go in order.  Mr. Reed first?

15       A.   Dr. Andrus.

16       Q.   Dr. Andrus first.

17       A.   Mr. Reed.

18       Q.   Mr. Reed.

19       A.   Dr. Cox.

20       Q.   Cox.

21       A.   And Dr. Johnson.

22       Q.   Dr. Johnson.

23            Anything else you complained about to

24  Dr. Ty [sic] that we haven't discussed?

25            A.   Dr. Todd?   Other than what the inmates in the



```
 1   prison complained about.
 2        Q.  And Dr. Miles?
 3        A.  They worked together.
 4        Q.  So same complaints?
 5        A.  Same complaints.
 6        Q.  And Dr. Johnson?
 7        A.  Same.  All of them worked together.
 8        Q.  So you were hearing this -- these complaints
 9   from inmates, that coursework was not being uploaded to
10   their devices, correct?
11        A.  They would send it through the message.
12        Q.  Any other complaints about the devices?
13        A.  Any other complaints?
14        Q.  Sure.  Just that their coursework wouldn't
15   upload?
16        A.  Coursework would upload.  Tablets wouldn't come
17   on.  We'd have to keep swapping them out.
18        Q.  Okay.  But tablet not coming on, we don't know
19   if that's hardware or software, correct?
20        A.  I don't know, no.
21        Q.  Were any devices to your knowledge sent back to
22   Wiley College for repair?
23        A.  No.
24        Q.  And so -- and I'm just trying to understand
25   your complaint.  And so your complaint, that these
```



```
 1   students were enrolled in classes and they weren't
 2   getting the class work that they should have been
 3   getting?
 4        A.  Correct.  Yes.
 5        Q.  And is it your testimony that Wiley College was
 6   receiving federal funds for this program but these
 7   students weren't receiving the benefits, correct?
 8        A.  Yes.
 9        Q.  Any other complaints that we're talking about
10   in terms of the alleged misuse of federal funds?
11        A.  As far as...
12        Q.  As far as your allegations.  Your allegation is
13   that you were retaliated against for complaining against
14   the misuse of federal funds.
15        A.  Uh-huh.
16        Q.  I'm trying to understand what it is you're --
17   you were -- specifically, you were complaining about?
18        A.  Okay.  So I met with Dr. Bradley February the
19   10th.
20        Q.  Okay.  When you're talking about to whom you've
21   spoken with --
22        A.  Uh-huh.
23        Q.  -- but I -- I need to know the substance of
24   what you were complaining about to Dr. Bradley.
25        A.  Family members had called saying that they
```



```
 1    wanted to know what's going on with their family member.
 2    They was enrolled in this school and they filed for
 3    financial aid and they don't have work on their tablet.
 4    The State of Louisiana was sending e-mails to
 5    Dr. Johnson.  He wasn't responding.  The prison liaisons
 6    were complaining because the students was coming to them
 7    to complain.  Dr. Johnson was not answering the e-mail.
 8    So they would e-mail me and call me, and I couldn't
 9    answer their questions as to why their students don't
10    have work on their tablets.
11              MR. DEPONTE:  Okay.  So I'm just going to
12    object as nonresponsive.
13         Q.  (BY MR. DEPONTE)  Because really my only
14    question was, what is it that you complained about with
15    respect to the use or misuse of federal funds?
16         A.  What --
17         Q.  And you never mentioned federal funds anywhere
18    in there.  So what is it that you were complaining about
19    regarding federal funds?
20         A.  Federal funds because they was funded by Second
21    Chance Pell.  They got money for advices [sic] and they
22    got federal money from these students to give them an
23    education.
24         Q.  Okay.  But the devices were already there when
25    you started in this position, correct?
```



```
 1    2023, the devices didn't work?
 2         A.  They did work, but it'd all depend.
 3         Q.  Well, the LMS system was the only system used
 4    to upload information to the tablets, correct?
 5         A.  No.
 6         Q.  Okay.  What other systems were used to upload
 7    information to the tablets or coursework?
 8         A.  Canvas.
 9         Q.  Was there any issue unloading Canvas to the
10    devices?
11         A.  Yes.
12         Q.  What were some of the issues uploading Canvas?
13         A.  Same thing.  The students -- they had a Second
14    Chance Pell Canvas outside of Wiley's regular Canvas.  A
15    lot of the courses would not populate.  Did not
16    populate.
17         Q.  And who was responsible for uploading the
18    Canvas work?
19         A.  The instructors.
20         Q.  So were you involved at all in the financial
21    aid that the inmates received for their coursework?
22         A.  No.
23         Q.  So you weren't involved when money was paid
24    from -- I guess, through the grant to the college for
25    the coursework, correct?
```



```
 1        A.   No, I was not involved.
 2        Q.   And would you agree with me, then, that you
 3   were not involved with any refunds that the college
 4   might have provided as a result of any courses not
 5   taken?
 6        A.   No.
 7        Q.   No, you would not agree with me?
 8        A.   Ask that again.
 9        Q.   Yeah.   Sure.   And I'm sorry, I asked a really
10   bad question.
11             Were you involved in any way with any
12   refunds given --
13        A.   I didn't get off into the financial part.
14        Q.   Okay.
15        A.   With the students.
16        Q.   So if a student pays through financial aid for
17   a course, you don't know, if they didn't get the course,
18   whether or not that money was refunded to the college or
19   refunded to the student, correct?
20        A.   No, I don't know.
21        Q.   Do you have any understanding about whether or
22   not refunds occurred if a student dropped a course?
23        A.   I'm not sure.
24        Q.   So if a student drops a course, say, midway
25   through the course for whatever reason, they get
```



1   paroled, they're -- go into solitary, whatever reason,

2   do you know how that's handled financially?

3        A.  Yes.

4        Q.  Okay.  How is that handled financially?

5        A.  So when a student go in lockdown or get

6   discharged or whatever, the prison would send me a

7   withdrawal form.

8        Q.  Okay.

9        A.  And I would, in turn, send it to financial aid,

10  Ms. Cooper.  And once Ms. Cooper process it, she'll

11  send, I guess, a receipt or a paper saying that his case

12  has been closed out or whatever.  I don't know the

13  correct form or the terminology for it.

14       Q.  Okay.  But you don't have any knowledge about

15  what happens with respect to the funds for that course

16  for that particular inmate?

17       A.  No, I do not.

18       Q.  When does an inmate need to drop a course to

19  get a refund for the financial aid?  Like, how far into

20  the course can they go?

21       A.  I'm not sure.

22       Q.  Any other aspect about the Second Cho- --

23  Second Chance Pell Grant administered by Wiley College

24  that you complained about?

25       A.  Ask me that again.



```
 1        Q.  Sure.  Any other aspect about the Second Chance
 2   Pell Grant that Wiley administered that you complained
 3   about to someone at Wiley?
 4        A.  No, not to my knowledge.
 5        Q.  And did you ever send any of your complaints in
 6   writing?
 7        A.  To Dr. Johnson, yes.
 8        Q.  And when was that?
 9        A.  I can't recall.
10        Q.  And Dr. Johnson was your supervisor?
11        A.  At the time, yes.
12        Q.  And when was -- what period of time was
13   Dr. Johnson your supervisor?
14        A.  Whenever his start year was, I can't remember,
15   to 2023.
16        Q.  So over the course of -- between 2019 and 2023,
17   you only sent one complaint in writing?
18        A.  Well, Wylie's conditioned to not put stuff in
19   writing.
20        Q.  That's not my question.  My only question is,
21   between 2019 and 2023, you only put one complaint in
22   writing about the Second Chance Pell Grant?
23        A.  I can't recall.
24        Q.  So when you had issues with the devices or the
25   coursework uploading, did you tell somebody at the
```



 1         Q.  Did you have -- and you said earlier that you

 2   didn't have any issue with the job duties you were

 3   performing with either the SCP or -- Second Chance Pell

 4   Grant or the Extended Education Program?

 5         A.  I didn't but they did.

 6              And after this job description was given to

 7   me, it was revised.

 8         Q.  How so?

 9         A.  This is not the job description that I last

10   had.

11         Q.  That's not my question.

12         A.  How so?  Because it -- I'm not -- I don't know

13   word for word, but this is not the one that Dr. Johnson,

14   Dr. Cox and Dr. Gibson had me to sign.

15         Q.  So you're saying you signed another job

16   description?

17         A.  I did.

18         Q.  Okay.  And when was that?

19         A.  Sometime after -- sometime after this and

20   before my termination.

21         Q.  Okay.  And what additional or different

22   provisions are in the newer job description?

23         A.  I can't recall right offhand.

24              (Exhibit 5 marked.)

25         Q.  (BY MR. DEPONTE)  Let me hand to you what I've



```
 1    marked as Deposition Exhibit 5.  Do you recognize this
 2    document?
 3         A.  Yes.
 4         Q.  And here you are complaining about Dr. Johnson
 5    and your job responsibilities, correct, or at least
 6    Dr. Johnson?
 7                    MR. DOYLE:  Object to form.
 8         Q.  (BY MR. DEPONTE)  I'm sorry, strike that.
 9                    Are you complaining about Dr. Johnson in
10    this document?
11         A.  I am, yes.
12         Q.  And are you complaining about your job
13    description or your job duties in this form?
14         A.  I'm complaining about the mistreatment.
15         Q.  And to whom did you send this?
16         A.  I sent this to Ms. Moody, HR.
17         Q.  And the document itself is undated.  When did
18    you draft this document?
19         A.  I'm not sure.  But the dates are in -- the --
20    most of the dates are in here.  I'm not sure the date.
21         Q.  And if you look through this document, just to
22    be clear, there is nothing in here about the Second
23    Chance Pell Grant issues that you said you complained
24    about, correct?
25         A.  It is.  I have -- do you want me to...
```



```
 1        Q.  Go ahead.  I'm sorry.  Where?

 2        A.  It's a lot of stuff in here talking about the

 3   Second Chance Pell.

 4        Q.  Which line?  Which line are you complaining

 5   about the misuse of funds regarding the Second Chance

 6   Pell Grant?

 7        A.  I expressed my feelings --

 8        Q.  Okay.

 9        A.  -- to Dr. --

10        Q.  But you're not talking about the Second Chance

11   Pell?

12        A.  No.

13        Q.  Okay.

14                 (Exhibit 6 marked.)

15        Q.  (BY MR. DEPONTE)  Let me hand to you what I've

16   marked as Deposition Exhibit 6.  Do you recognize this

17   document?

18        A.  Yes.

19        Q.  And what is this document?

20        A.  What is this document?  About Dr. Johnson's

21   behavior.

22        Q.  Okay.  And as you look through this, would you

23   agree with me that there's no complaint in here about

24   the Second Chance Pell Grant?

25        A.  There isn't.
```



```
 1        A.  Repeat that.
 2        Q.  Sure.  By March 1st, 2023, the date of your
 3   termination letter, you already knew that Wiley College
 4   was ending its relationship or partnership with the
 5   State of Louisiana, correct?
 6        A.  Yes.
 7        Q.  And according to your testimony earlier, that
 8   you had approximately 84 inmates in the program and only
 9   16 Adult Education individuals, that would have been
10   about 84 percent of the work you were doing, correct?
11        A.  I assume.
12        Q.  Well, 84 out of a hundred is 84 percent,
13   correct?
14        A.  Yes.
15        Q.  And so all those 84 inmates were dropping off
16   your responsibility list, correct?
17        A.  I was told.
18        Q.  Well, they did drop off your responsibility,
19   correct?
20        A.  Yes.  Because I was terminated.
21        Q.  You don't have an understanding about whether
22   or not the program was ending before you were
23   terminated?
24        A.  I did not.
25        Q.  But you just told me that you had a
```



1          A.   Because that's the culture of Wiley College.

2          Q.   Well, you said you had been -- I forgot the

3    word you used -- trained not to put things in writing;

4    is that correct?

5          A.   Yes.

6          Q.   But you've got about eight or nine exhibits in

7    front of you where you put stuff in writing, correct?

8          A.   This is for my personal protection as -- put

9    things in wi- -- in writing of when you had a

10   disagreement with someone or you wanted to correct

11   something or you wanted to express your concerns about

12   how things was being...

13         Q.   Things were being...

14         A.   How things was being handled.

15         Q.   And if you look with me at Deposition Exhibit

16   11, on the second page, this is the first time you ever

17   mention retaliation or being an alleged whistleblower,

18   correct?

19         A.   What page?

20         Q.   It's the second page, Number 307 at the bottom,

21   Bates label.

22              MR. DOYLE:   Object to form.

23         Q.   (BY MR. DEPONTE)   Would you agree with me that

24   this is the first time you've mentioned being an alleged

25   whistleblower or any alleged retaliation?



1        A.   Yes.

2             Q.   And this was after your termination date

3   though, correct?

4             A.   What was after my termination date?

5             Q.   Deposition Exhibit 11.

6             A.   When I wrote it to them, yes, of -- description

7   of things that I had endured.

8             Q.   You state that, on February 10th, 2023, you

9   requested a meeting with Dr. Bradley, correct?

10            A.   Yes.

11            Q.   What did you discuss with Dr. Bradley?

12            A.   It's in the form.

13            Q.   I'm asking you.

14            A.   I discussed with Dr. Bradley the grievance with

15  Dr. Johnson.   I discussed with Dr. Bradley the

16  inappropriate use of funds, the lack of communication,

17  all the -- all the complaints that the prison had.

18            Q.   But to be clear you -- strike that.

19                 Was the prison in any way involved with the

20  funds from the pell grant?

21       A.   Meaning?

22            Q.   They didn't allocate money for the pell grant,

23  did they?

24            A.   The -- I'm not sure.

25            Q.   So the money comes to the college through the



```
 1   pell grant, correct?
 2        A.  Yes.
 3        Q.  Money -- the college uses the money to pay for
 4   the program at the State of Louisiana prisons, correct?
 5        A.  Yes.
 6        Q.  The State of Louisiana prisons are not
 7   responsible for the administration of the pell grant
 8   money, correct?
 9        A.  I'm not sure.
10        Q.  Well, you're the coordinator for the program.
11   You don't know?
12        A.  I don't get into finance.  No.
13        Q.  Okay.  You just -- not that you are
14   disagreeing; you just don't know?
15        A.  I don't know.
16        Q.  Okay.  Are you aware that the -- or that Wiley
17   College was audited every year --
18        A.  Yes.
19        Q.  -- for their finances?
20        A.  Yes.
21        Q.  And do you know who conducted that audit?
22        A.  No.
23        Q.  Were you involved with the audit?
24        A.  No.
25        Q.  Do you know what happened with the audit?
```



```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF TEXAS
 2                     MARSHALL DIVISION

 3   KAREN LESTER,              )
          Plaintiff,           )
 4                             )
                               )
 5   VS.                       )CASE NO:23-cv-00624-RSW-RSP
                               )
 6   WILEY COLLEGE,            )
          Defendant            )
 7
                    REPORTER'S CERTIFICATION
 8                 DEPOSITION OF KAREN LESTER
                       FEBRUARY 4, 2025
 9

10        I, Melanie Seifert, Certified Shorthand Reporter in
     and for the State of Texas, hereby certify to the
11   following:

12        That the witness, KAREN LESTER, was duly sworn by
     the officer and that the transcript of the oral
13   deposition is a true record of the testimony given by
     the witness;

14

15        I further certify that pursuant to FRCP Rule 30(F)
     (1) that the signature of the deponent:

16

17        _____ was requested by the deponent or a party
     before the completion of the deposition and returned
18   within 30 days from date of receipt of the transcript.
     If returned, the attached Changes and Signature Page
19   contains any changes and the reasons therefor:

20

21        __X_ was not requested by the deponent or a party
     before the completion of the deposition.

22

23        I further certify that I am neither counsel for,
     related to, nor employed by any of the parties or
     attorneys in the action in which this proceeding was
24   taken, and further that I am not financially or
     otherwise interested in the outcome of the action.

25
```



1          Further, I am not a relative or employee of any
   attorney of record in this cause, nor do I have a
2  financial interest in the action.

3          Certified to by me this 8th day of February, 2025.

4

5                    *Melanie Seifert*

6                    _____
                     MELANIE SEIFERT, CSR 7234
7                    Expires October 31, 2026
                     Script Deposition Services, LLC
                     Firm Registration No. 11972
8                    P.O. Box 60
                     China Spring, Texas 76633
9                    (903) 470-0098

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

